79 F.3d 1250
 42 ERC 1385, 26 Envtl. L. Rep. 20,959
 CONSERVATION LAW FOUNDATION, INC., Petitioner,
v.
James BUSEY, Administrator, Federal Aviation Administration,
et al., Respondents.
TOWN OF NEWINGTON, NEW HAMPSHIRE, Petitioner,
v.
DEPARTMENT OF TRANSPORTATION, et al., Respondents.
CONSERVATION LAW FOUNDATION, INC., Plaintiff-Appellant,
v.
DEPARTMENT OF the AIR FORCE, et al., Defendants-Appellees.
TOWN OF NEWINGTON, NEW HAMPSHIRE, Plaintiff-Appellant,
v.
DEPARTMENT OF the AIR FORCE, et al., Defendants-Appellees.
CONSERVATION LAW FOUNDATION, INC., and Town of Newington,
New Hampshire, Plaintiffs-Appellees,
v.
DEPARTMENT OF the AIR FORCE, et al., Defendants-Appellees.
State of New Hampshire, and Pease Development Authority,
Defendants-Appellants.
CONSERVATION LAW FOUNDATION, INC., Plaintiff-Appellee,
v.
DEPARTMENT OF the AIR FORCE, et al., Defendants-Appellants.
 Nos. 92-1335, 92-1464, 95-1019, 95-1020, 95-1047 and 95-1048.
 United States Court of Appeals,
First Circuit.
 Heard June 7, 1995.
Decided April 2, 1996.
 
 1
 Appeals from the United States District Court for the District of New Hampshire [Martin F. Loughlin, Senior District Judge].
 
 
 2
 Lewis M. Milford, Boston, MA, with whom Mark A. Sinclair, Waterbury, VT, Robert A. Backus and Backus, Meyer & Soloman, Manchester, NH, were on brief for Conservation Law Foundation.
 
 
 3
 Perry M. Rosen, with whom Dana C. Nifosi, Cutler & Stanfield, Washington, DC, Malcolm R. McNeill, Jr. and McNeill & Taylor, P.A., Dover, NH, were on brief for Town of Newington, New Hampshire.
 
 
 4
 Jeffrey P. Kehne, Attorney, Environment & Natural Resources Division, U.S. Department of Justice, with whom Lois J. Schiffer, Assistant Attorney General, Beverly Sherman Nash, Richard Sarver, Edward J. Shawaker, Attorneys, Environment & Natural Resources Division, U.S. Department of Justice, Washington, DC, Douglas J. Heady, Office of the General Counsel, Department of the Air Force, Alexandria, VA, Daphne A. Fuller, Attorney, Office of the Chief Counsel, Federal Aviation Administration, New York City, and John R. Michaud, Office of General Counsel, U.S. Environmental Protection Agency, Portland, ME, were on brief for the federal parties.
 
 
 5
 Donald W. Stever, with whom Jeffrey R. Howard, Attorney General, Steven M. Houran, Deputy Attorney General, Office of the Attorney General, Environmental Protection Bureau, and Dewey Ballantine, Washington, DC, were on brief for State of New Hampshire and Pease Development Authority.
 
 
 6
 Before SELYA and CYR, Circuit Judges, and SCHWARZER,* Senior District Judge.
 
 
 7
 ON PETITION FOR REVIEW OF AN ORDER OF THE FEDERAL AVIATION
 
 ADMINISTRATION
 
 8
 SCHWARZER, Senior District Judge.
 
 
 9
 We must decide whether defendants have complied with various federal environmental laws that apply to the conversion of land on Pease Air Force Base (Pease) in New Hampshire to civilian use incident to the base's closure. The United States Air Force entered into a long-term lease of a portion of the base to Pease Development Authority (PDA). Concerned about the resulting effects on the clean up of hazardous wastes on the base and the air quality in the area, the Conservation Law Foundation (CLF) and the Town of Newington, New Hampshire (Newington) challenge the Air Force's decision to lease the property and the support of that decision by other federal agencies. CLF and Newington contend that the Air Force and the Environmental Protection Agency (EPA) violated section 176(c) of the Clean Air Act (CAA), 42 U.S.C. § 7506(c) (Supp. III 1991), section 102(2)(C) of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332(2)(C) (1988), and section 120(h)(3) of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9620(h)(3) (1988). PDA, the State of New Hampshire, and several other interested parties have intervened and, along with the Air Force and the EPA, oppose the relief sought.
 
 
 10
 In a lengthy opinion ruling on the parties' cross-motions for summary judgment, the district court found that the Air Force had violated NEPA and CERCLA and directed it to submit a Supplemental Final Environmental Impact Statement (Supplemental FEIS), including a remedial design for contaminated parcels covered by the lease. The district court denied injunctive relief, however, and dismissed all remaining claims. Conservation Law Found. v. Department of the Air Force, 864 F.Supp. 265 (D.N.H.1994).
 
 
 11
 Plaintiffs have appealed from the dismissal of their CAA claims and the denial of injunctive relief. The federal defendants have cross-appealed from the finding that they violated CERCLA, but have not appealed the district court's order directing them to prepare a Supplemental FEIS. We have appellate jurisdiction under 28 U.S.C. § 1291. We reverse the judgment in so far as it found a CERCLA violation but affirm in all other respects.
 
 
 12
 Also before us are petitions filed by CLF and Newington to review an order of the Federal Aviation Administration (FAA) approving PDA's airport development plan. We have jurisdiction under 49 U.S.C. app. § 1486(a) and deny the petitions with respect to the CAA claim and retain jurisdiction of the NEPA claim pending completion of the Supplemental FEIS.
 
 I. BACKGROUND FACTS
 
 13
 Acting under the Base Closure and Realignment Act of 1988 (the Base Closure Act), Pub.L. No. 100-526, 102 Stat. 2627 (1988) (codified as amended at 10 U.S.C. § 2687 (1988 & Supp. V 1993)), the Air Force closed Pease in March 1991. Located adjacent to Newington and Portsmouth, New Hampshire, the base occupies some 4,200 acres and comprises extensive facilities that supported Air Force operations, including a runway. PDA was created as an agency of the State of New Hampshire to acquire certain parcels of land within the base and to develop and implement a plan for their reuse. It ultimately developed a plan envisioning a commercial airport, light industry, various commercial uses, retail space, and open space.
 
 
 14
 In preparation for the transfer of land to PDA, the Air Force in February 1990 launched the process of complying with applicable environmental requirements. The details of the process are set out at length in the district court's opinion, see 864 F.Supp. at 270-72, and a summary will suffice here. In February 1991, the Air Force published a Draft Environmental Impact Statement (DEIS) on which CLF and the EPA submitted comments mainly addressing air quality concerns. In April 1991, the Air Force entered into a Federal Facility Agreement (FFA) with the EPA and the State of New Hampshire spelling out its environmental obligations incident to the transfer. In June 1991, the Air Force prepared a Final Environmental Impact Statement (FEIS). The FEIS stated that, although development under the plan, including the increased traffic it would generate, would not result in violations of state or federal air quality standards, it would have an impact on New Hampshire's ability to achieve the ozone precursor reductions required by the CAA. To resolve these air quality concerns, PDA, the EPA, and the New Hampshire Department of Environmental Services (NHDES) on August 1, 1991, entered into a Memorandum of Understanding (MOU). The EPA then issued its comments on the FEIS, stating that while the project would reduce New Hampshire's ability to achieve compliance with the CAA, the MOU provided a framework for compliance.
 
 
 15
 As required by the Base Closure Act, the Air Force then prepared its initial Record of Decision (ROD), documenting its decisions regarding the closure of Pease and the disposition of the property. The ROD addressed, among other things, environmental issues, including the CAA's requirement that the project conform with the New Hampshire State Implementation Plan (SIP) and CERCLA's requirement that the Air Force undertake certain remedial measures to clean up contaminated sites prior to the transfer of those sites to PDA. See 42 U.S.C. § 7506(c)(1); 42 U.S.C. § 9620(h)(3).
 
 
 16
 Because the PDA plan contemplated civilian airport operations, FAA approval was required under the Surplus Property Act of 1944, 50 U.S.C. app. § 1622(g) (1988) (subsequently recodified at 49 U.S.C. §§ 47151-47153 (Supp.1994)). In February 1992, the FAA issued an ROD approving elements of the plan and recommending that the Air Force proceed with its proposed transfer of property to PDA.
 
 
 17
 In March 1992, CLF filed this action in the district court, alleging that the Air Force and the EPA had violated the CAA and NEPA. In June 1992, Newington filed its action asserting the same claims, as well as a claim under CERCLA. These actions were later consolidated. CLF and Newington also filed petitions in this court for review of the FAA's February 1992 ROD, alleging that the FAA violated NEPA and the CAA. The petitions were stayed pending the outcome of the district court proceedings and are now before us along with the appeals from the judgment below.
 
 
 18
 While these actions were pending, the Air Force continued to pursue the administrative proceedings preparatory to the transfer. In March 1992, it issued a Memorandum for the Record updating its earlier conformity determination. In April 1992, it issued a Supplemental ROD in which it rendered its final determination concerning the disposal of the Pease parcels, including an acknowledgment that remedial action on contaminated areas had to be completed before it could transfer those parcels by deed. The Air Force then prepared a Preliminary Environmental Survey and, on the basis of the survey, issued its Finding of No Significant Impact (FONSI). In April 1992, the Air Force entered into a 55-year lease and contract of conveyance to PDA covering these parcels.
 
 II. SCOPE OF REVIEW
 
 19
 We review de novo the district court's grant of summary judgment, Town of Norfolk v. United States Army Corps of Eng'rs, 968 F.2d 1438, 1445 (1st Cir.1992), as well as its interpretation of the controlling statutes, United Technologies v. Browning Ferris Indus., 33 F.3d 96, 98 (1st Cir.1994), cert. denied, --- U.S. ----, 115 S.Ct. 1176, 130 L.Ed.2d 1128 (1995). Review of the district court's grant or denial of injunctive relief, in so far as it involves no question of law, is for abuse of discretion. Sunshine Dev., Inc. v. FDIC, 33 F.3d 106, 111 (1st Cir.1994); Narragansett Indian Tribe v. Guilbert, 934 F.2d 4, 5 (1st Cir.1991).
 
 
 20
 Regarding our review of the district court's assessment of the record on which agency action was based, we have taken "a practical approach to deciding what standard of review to apply." Sierra Club v. Marsh, 976 F.2d 763, 769 (1st Cir.1992). When the district court's judgment turns upon its own assessment of evidence, "or even upon lengthy district court proceedings in which knowledgeable counsel explain the agency's decision-making process in detail, we will show appropriate hesitation to overturn that judgment.... But, where the district court simply reviews a set of agency documents and, applying the same legal standard as we apply here, reaches a particular legal conclusion about the 'reasonableness' of an agency's action, we have greater legal freedom to differ with the district court's ultimate characterization of agency behavior." Sierra Club v. Marsh, 769 F.2d 868, 872 (1st Cir.1985). With these principles in mind, we turn to the merits of the appeal.
 
 III. THE CLEAN AIR ACT CLAIMS
 
 21
 The purpose of the CAA, as the district court observed, is "to protect and enhance the Nation's air quality, to initiate and accelerate a national program of research and development designed to control air pollution, to provide technical and financial assistance to the States in the execution of pollution control programs, and to encourage the development of regional pollution control programs." See 864 F.Supp. at 273 (citing 42 U.S.C. § 7401(b) (1988)). Pursuant to the Act, the EPA established National Ambient Air Quality Standards (NAAQS) reflecting the maximum concentration levels of particular pollutants (criteria pollutants) allowable to protect public health. See 42 U.S.C. § 7409 (Supp. III 1991). Among them were NAAQS for ozone and carbon monoxide, both of which are relevant here. See 40 C.F.R. §§ 50.8, 50.9 (1995). Responsibility for achieving and maintaining the NAAQS falls on the states, which are required to submit state implementation plans (SIPs) specifying the manner in which they will achieve and maintain the NAAQS for the various criteria pollutants. See 42 U.S.C. § 7407 (1988 & Supp. III 1991).
 
 
 22
 The EPA and the states have designated different regions according to the level of criteria pollutants in each area. See 42 U.S.C. § 7407(d)(1)(A). A region which has not attained the NAAQS for a certain criteria pollutant is designated a "nonattainment" area; a region about which there are insufficient data to determine compliance with the NAAQS is designated "unclassified" and deemed in compliance with the NAAQS. See id. At the time the decisions challenged here were made, the Portsmouth-Dover-Rochester region, where the Pease project is located, was designated a "serious nonattainment" area for ozone and an "unclassified" area for carbon monoxide. See 40 C.F.R. § 81.330 (1991).
 
 
 23
 For serious nonattainment areas for ozone, the statutory deadline for attaining the NAAQS is November 15, 1999. 42 U.S.C. § 7511(a)(1) (Supp. III 1991). To ensure progress toward that goal, the 1990 amendments to the CAA require states to revise their SIPs in a manner that will result in attainment of both the ultimate deadline and interim milestones established by the 1990 amendments. See 42 U.S.C. § 7511a(c)(2) (Supp. III 1991).
 
 
 24
 To further promote attainment of the NAAQS for different criteria pollutants, the 1990 amendments also added specific criteria to section 7506(c)(1) (section 176(c)(1) of the CAA), the conformity provision of the Act, to wit, subsections (A) and (B)(i)-(iii). See S.Rep. No. 101-228, 101st Cong., 2d Sess. 28 (1990), reprinted in 1990 U.S.C.C.A.N. 3385, 3414. The conformity provision prohibits federal agencies from approving or supporting any activity which does not conform to an SIP. Under the new criteria, conformity means that the activity will not cause new violations, increase the frequency or severity of violations, or delay attainment of various standards, requirements, and milestones. See 42 U.S.C. § 7506(c)(1)(B).
 
 
 25
 Plaintiffs claim that the EPA, the Air Force and the FAA violated the conformity provision. Plaintiffs make three arguments: (1) that no determination of conformity could be made until NEPA had been complied with; (2) that the EPA failed to make a conformity determination; and (3) that the Air Force and the FAA violated the substantive requirements of the conformity provision. As a preliminary matter, however, we must address PDA's contention that the district court lacked subject matter jurisdiction over plaintiffs' CAA claims.
 
 A. Subject Matter Jurisdiction
 
 26
 Plaintiffs assert that jurisdiction over their conformity determination claims exists under the citizen suit provision of the CAA, 42 U.S.C. § 7604(a)(1) (1988 & Supp. III 1991), or in the alternative, under the Administrative Procedure Act (APA), 5 U.S.C. § 702 (1988). Defendants dispute that jurisdiction exists under either provision. We address first the knotty question of whether jurisdiction exists under the citizen suit provision; if it does, jurisdiction under the APA is precluded. See 5 U.S.C. § 704 (1988) ("Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review" under the APA (emphasis added)). See Oregon Natural Resources Council v. United States Forest Serv., 834 F.2d 842, 851 (9th Cir.1987); Allegheny County Sanitary Auth. v. EPA, 732 F.2d 1167, 1177 (3d Cir.1984); Environmental Defense Fund v. Tidwell, 837 F.Supp. 1344, 1355-57 (E.D.N.C.1992) (APA provides a right of review of agency decisions precisely where a plaintiff's claim is not covered by the citizen suit provisions of the substantive act).
 
 
 27
 1. The Citizen Suit Provision, 42 U.S.C. § 7604.
 
 
 28
 We addressed the issue of citizen suit jurisdiction over claims of violation of the conformity provision once before in Conservation Law Found. v. Federal Highway Admin., 24 F.3d 1465 (1st Cir.1994) (CLF ). Although we held citizen suit jurisdiction to extend to the conformity provision claims asserted there, we cautioned that because the "issue is a close one.... [and] because the outcome of [the] case does not depend upon [the] jurisdictional ruling, this Court remains free to revisit the issue in a future case where it may be decisive." Id. at 1478 n. 6. We do so now.
 
 
 29
 a. Legislative History and Precedent. "In enacting [the citizen suit] provision, Congress expanded federal court jurisdiction by circumventing the diversity of citizenship, jurisdictional amount, and traditional standing requirements." Wilder v. Thomas, 854 F.2d 605, 613 (2d Cir.1988), cert. denied, 489 U.S. 1053, 109 S.Ct. 1314, 103 L.Ed.2d 583 (1989). See S.Rep. No. 91-1196, 91st Cong., 2d Sess. 64 (1970), reprinted at Natural Resources Defense Council, Inc. v. Train, 510 F.2d 692, 725, Appendix B (D.C.Cir.1974). Prior to the enactment of the citizen suit provision, "[g]overnment initiative in seeking enforcement under the Clean Air Act [had] been restrained." S.Rep. No. 91-1196, reprinted at 510 F.2d at 723. By authorizing citizens to bring suit for violations of CAA standards, Congress sought to "motivate governmental agencies charged with the responsibility to bring enforcement and abatement proceedings." Id. In recognition of the fact that "[f]ederal facilities generate considerable air pollution," the citizen suit provision allowed suits to be "brought against an individual or government agency." Id. at 724.
 
 
 30
 As Congress opened the door to citizen suits, however, it also sought to limit that jurisdiction to claims that "would not require reanalysis of technological or other considerations at the enforcement stage" and would have to meet "an objective evidentiary standard." Id. To that end, Congress "carefully restricted [citizen suit jurisdiction] to actions where violations of standards and regulations or a failure on the part of officials to act are alleged." Id. at 723.
 
 
 31
 Conscious of the concerns expressed in the legislative history, courts interpreting citizen suit jurisdiction have largely focused on whether the particular standard or requirement plaintiffs sought to enforce was sufficiently specific. Thus, interpreting citizen suit jurisdiction as limited to claims "for violations of specific provisions of the act or specific provisions of an applicable implementation plan," the Second Circuit held that suits can be brought to enforce specific measures, strategies, or commitments designed to ensure compliance with the NAAQS, but not to enforce the NAAQS directly. See, e.g., Wilder, 854 F.2d at 613-14. Courts have repeatedly applied this test as the linchpin of citizen suit jurisdiction. See, e.g., Coalition Against Columbus Ctr. v. City of New York, 967 F.2d 764, 769-71 (2d Cir.1992); Cate v. Transcontinental Gas Pipe Line Corp., 904 F.Supp. 526, 530-32 (W.D.Va.1995); Citizens for a Better Env't v. Deukmejian, 731 F.Supp. 1448, 1454-59 (N.D.Cal.), modified, 746 F.Supp. 976 (1990).
 
 
 32
 Our decision in CLF and plaintiffs' arguments have therefore focused on whether the conformity provision meets the requisite level of specificity to serve as the basis of a citizen suit. Before asking whether the conformity provision passes the specificity test, however, we must consider the threshold issue whether the conformity provision falls within one of the statutory categories of violations for which citizen suits are authorized.
 
 
 33
 b. Terms of the Statute. The CAA permits any person to bring a civil action "against any person ... who is alleged to have violated or to be in violation of ... an emission standard or limitation under this chapter...." 42 U.S.C. § 7604(a)(1)(A). An "emission standard or limitation" is defined as "a schedule or timetable of compliance, emission limitation, standard of performance or emission standard ... which is in effect under this chapter ... or under an applicable implementation plan." 42 U.S.C. § 7604(f)(1) (Supp. III 1991). The additional definitions in subsections (2), (3), and (4) are not applicable here.[1] Thus, citizen suit jurisdiction over a violation of the conformity provision is subject to a two-prong test: (1) the conformity provision must be a schedule or timetable of compliance, emission limitation, standard of performance, or emission standard, and (2) it must be in effect under this chapter or an applicable implementation plan. See Cate, 904 F.Supp. at 529. The conformity provision meets the second prong; as a provision of the Act, it is clearly "in effect under the Act." See CLF, 24 F.3d at 1477. The sole question is whether the conformity provision qualifies as (1) a schedule or timetable of compliance, (2) an emission limitation, (3) a standard of performance, or (4) an emission standard, as these terms are defined by other provisions of the Act. If it does not fall within one of these four categories, there is no citizen suit jurisdiction over the conformity provision claims.
 
 
 34
 (i) Emission Limitation/Emission Standard. Section 7602(k) defines the terms "emission standard" and "emission limitation" to mean "a requirement established by the State or the Administrator which limits the quantity, rate, or concentration of emissions of air pollutants on a continuous basis...." 42 U.S.C. § 7602(k) (Supp. III 1991); see also 40 C.F.R. § 51.100(z) (1991) (EPA's regulations implementing the CAA). The conformity provision is not "a requirement established by the State or the Administrator"; it is a provision of the CAA enacted by Congress. And while the provision seeks to ensure conformity with existing emission standards or limitations, it does not itself limit emissions of air pollutants. Thus, it is not an emissions limitation or standard.
 
 
 35
 (ii) Standard of Performance. Section 7602(l ) defines "standard of performance" as "a requirement of continuous emission reduction, including any requirement relating to the operation or maintenance of a source to assure continuous emission reduction." 42 U.S.C. § 7602(l ) (1988 & Supp. III 1991). CLF argues that the conformity provision constitutes a "standard of performance" within the meaning of section 7602(l ) because it prohibits a federal agency from supporting an activity unless that activity is "consistent with 'reducing' the severity and number of violations in a nonattainment area and will not delay timely attainment of any required emission reductions." In support of its argument, CLF relies upon this court's decision in CLF, 24 F.3d 1465, to which we now turn.
 
 
 36
 In that case plaintiff challenged the Federal Highway Administration's approval of a highway project on the ground, among others, that it violated the conformity provisions of the CAA. Unlike the instant case, CLF involved conformity of a transportation plan subject to section 7506(c)(3). Under section 7506(c)(3)(A)(iii), a transportation plan or program is in conformity if it contributes to annual emission reductions in amounts specified elsewhere in the CAA.
 
 
 37
 Referring to " § 7506(c)(1) & (c)(3)," the court held that "[t]hese conformity requirements plainly constitute an emissions 'standard of performance.' " CLF, 24 F.3d at 1477 (emphasis added).[2] In so holding, the court observed that those provisions "mandate that defendants demonstrate that their transportation projects 'would contribute to annual emissions reductions consistent with' the levels set out in § 7511a(b)(1) and § 7512a(a)(7)." Id. This language reveals that the court was relying on § 7506(c)(3) for its finding that the conformity requirements constitute a standard of performance. See 42 U.S.C. § 7506(c)(3)(A)(iii) (to be in conformity, transportation plans or programs in ozone and carbon monoxide nonattainment areas must "contribute to annual emissions reductions consistent with sections 7511a(b)(1) and 7512a(a)(7)").
 
 
 38
 On further reflection, it appears to us that the route to section 7506(c)(3) lies through section 7506(c)(1). In CLF, as in the case before us, plaintiffs were challenging government action in approving an activity that did not conform to an approved implementation plan or other conformity criteria. See id. at 1478. While subsection (c)(3) spells out particular conformity criteria for transportation plans, the crux of the action remained the noncompliance by a government agency, not the violation of an emission standard by the activity itself. The foundation of the plaintiffs' claims, both there and here, is the subsection (c)(1) prohibition of the federal agency's approval or support of any activity not in conformity with an approved plan or other standards, requirements, or milestones.
 
 
 39
 As noted above, a standard of performance is defined as "a requirement of continuous emission reduction...." 42 U.S.C. § 7602(l ) (emphasis added). Nothing in section 7506(c)(1) imposes an emissions reduction requirement. That section prohibits a federal agency from approving, supporting, or funding any activities that do not "conform" to the provisions of an SIP or other standards, emissions reduction requirements, and milestones. The sources of those standards, requirements, and milestones may include the NAAQS or standards and requirements set out in an SIP or provisions of the CAA itself. Section 7605(c)(1)(A) and (B) define what standards must be met for a project to be in conformity. In the case of a transportation plan or program, such as the one at issue in CLF, section 7506(c)(3) imposes additional standards. Thus, the conformity provision refers to or involves standards, reduction requirements, and milestones, in the sense that a federal agency must determine that a project meets those standards in order to approve or support it. However, the conformity provision itself imposes no such standards or requirements. It simply imposes a duty on federal agencies not to approve or support any activity that does not meet standards, requirements, and milestones set out in an SIP or the CAA.
 
 
 40
 (iii) Schedule or Timetable of Compliance. Section 7602(p) defines a "schedule and timetable of compliance" to mean "a schedule of required measures including an enforceable sequence of actions or operations leading to compliance with an emission limitation, other limitation, prohibition, or standard." 42 U.S.C. § 7602(p) (1988). CLF argues that the conformity provision is a "schedule or timetable of compliance" under section 7604(f) because the "[c]onformity section 176(c)(1)(B)(iii) specifically prohibits federal agencies from supporting any activity if it will 'delay timely attainment' of the schedule of compliance set for nonattainment states like New Hampshire to reach 15% emission reduction milestones in 1996 and full ozone attainment in 1999." This argument is, however, inapposite. The issue is not whether the conformity provision requires the federal agency to determine that a project complies with a schedule or timetable of compliance found elsewhere; rather it is whether the conformity provision is itself a schedule or timetable of compliance. Plaintiffs here are not suing a polluter for violation of the schedule or timetable of compliance referenced in section 176(c)(1)(B)(iii); they are suing three federal agencies for approving and supporting a project that may violate that schedule or timetable of compliance.
 
 
 41
 It might be argued that the conformity provision itself constitutes a "schedule or timetable of compliance" as defined by section 7602(p) in that it requires federal agencies to follow "an enforceable sequence of actions ... leading to compliance with an emission limitation, other limitation, prohibition, or standard." See 42 U.S.C. § 7602(p). The conformity provision requires federal agencies to follow a sequence of actions to ensure a project's conformity with limitations and standards in an existing SIP or with the NAAQS. Those actions, though not specified in the statute, necessarily include analyses comparing "the most recent estimates of emissions" in the proposed project area with the projected emissions in the area were the project to go forward, an assessment whether the project meets the specific statutory criteria for conformity based on those analyses, and a determination whether to support or approve the project. See 42 U.S.C. § 7506(c)(1); see also Cate, 904 F.Supp. at 532 (finding that an agreement requiring gas pipe line company to conduct certain modeling and analyses for determining what measures would eliminate violations of the NAAQS and to develop and submit a plan specifying corrective measures and milestone dates for instituting corrective measures constituted a "schedule" of compliance within the meaning of 42 U.S.C. §§ 7604(f)(1), 7602(p)).
 
 
 42
 We reject this argument, however, on the basis of the EPA's interpretation of "compliance schedule" in its regulations implementing the CAA. 40 C.F.R. § 51.100 (1991). Section 51.100(p) defines "compliance schedule" to mean "the date or dates by which a source or category of sources is required to comply with specific emission limitations contained in an implementation plan and with any increments of progress toward such compliance." (Emphasis added.) 40 C.F.R. § 51.100(q) defines "increments of progress" to mean "steps toward compliance which will be taken by a specific source...." (Emphasis added.) These definitions make clear that a schedule of compliance is a sequence of actions that a polluter must undertake by certain specified dates in order to achieve compliance with relevant emissions limitations or standards. The conformity requirements themselves do not fall within that definition.
 
 2. Review under the APA, 5 U.S.C. § 702
 
 43
 Having concluded that citizen suit jurisdiction does not extend to violations of the conformity provision, we turn to the question whether judicial review is available under the APA. In the absence of a contrary statutory provision, the APA entitles a person aggrieved by final agency action to judicial review and requires that agency action be set aside if "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §§ 702, 706(2)(A) (1988); see Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 375, 109 S.Ct. 1851, 1860, 104 L.Ed.2d 377 (1989). While the APA does not provide an independent source of subject matter jurisdiction, it does provide a federal right of action where subject matter jurisdiction exists under 28 U.S.C. § 1331 (giving district courts jurisdiction of all civil actions arising under the laws of the United States). See Japan Whaling Ass'n v. American Cetacean Soc'y, 478 U.S. 221, 230 n. 4, 106 S.Ct. 2860, 2866 n. 4, 92 L.Ed.2d 166 (1986); Califano v. Sanders, 430 U.S. 99, 104-07, 97 S.Ct. 980, 983-85, 51 L.Ed.2d 192 (1977).
 
 
 44
 Defendants argue that § 1331 cannot confer jurisdiction over the conformity claims against the Air Force because, under Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n, 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981), no implied private right of action exists under the Clean Air Act. Defendants' reliance on Sea Clammers is misplaced. In Sea Clammers, the Supreme Court held that a comprehensive statutory enforcement mechanism complemented by provisions for citizen suits precluded an implied private cause of action for damages. See Sea Clammers, 453 U.S. at 17-18, 101 S.Ct. at 2624-25. But an implied right of action is not a predicate for a right of judicial review under the APA. See, e.g., Oregon Natural Resources Council, 834 F.2d at 851. The central purpose of the APA is to "provid[e] a broad spectrum of judicial review of agency action." Bowen v. Massachusetts, 487 U.S. 879, 903, 108 S.Ct. 2722, 2737, 101 L.Ed.2d 749 (1988). Therefore, "[a] cause of action for review of [agency] action is available [under the APA] absent some clear and convincing evidence of legislative intention to preclude review." Japan Whaling, 478 U.S. at 230, 106 S.Ct. at 2866. The citizen suit provision of the CAA provides no "clear and convincing evidence of legislative intention to preclude review"; to the contrary, it includes an explicit savings clause for other rights of relief. See 42 U.S.C. § 7604(e) (1988) (preserving "any right which any person ... may have under any statute ... to seek ... any other relief"); Oregon Natural Resources Council, 834 F.2d at 851 n. 15 (same savings clause under Clean Water Act preserves right of review under APA); Hough v. Marsh, 557 F.Supp. 74, 77-79 (D.Mass.1982) (same). Moreover, cases decided after Sea Clammers have expressly recognized that the APA provides a right of review of agency decisions precisely where a plaintiff's claim is not covered by the citizen suit provision of the substantive act. See, e.g., Oregon Natural Resources Council, 834 F.2d at 851; Allegheny County Sanitary Auth., 732 F.2d at 1177; Tidwell, 837 F.Supp. at 1355-57. Other cases cited by defendants are equally inapposite since none involve judicial review of agency action. See, e.g., Greenfield and Montague Transp. Area v. Donovan, 758 F.2d 22, 26 (1st Cir.1985) ("mere existence of a disputed question of federal law does not confer federal question jurisdiction").
 
 
 45
 Finally, we must consider whether 42 U.S.C. § 7607(b) bars district court jurisdiction under the APA over the conformity provision claim against the EPA. Section 7607(b) provides for judicial review of "any ... final action of the Administrator" by the filing of a petition in the court of appeals. In this case, plaintiffs complain that the EPA violated section 7506 by approving and supporting the Pease project without making the requisite conformity determination. The obligation under that section runs to any "department, agency, [and] instrumentality of the Federal Government." Action by the EPA to comply with section 7506 is not action taken by it in its capacity of administrator and enforcer of the CAA. The text of the statute supports this distinction. Where it refers to obligations imposed on the EPA by the CAA, it imposes those obligations on the Administrator. See, e.g., 42 U.S.C. § 7506(c)(4)(A) ("the Administrator shall promulgate criteria and procedures for determining conformity ... of ... the activities referred to in [section 7506(c)(1) ]"; 42 U.S.C. § 7601(a)(1) ("the Administrator is authorized to prescribe such regulations as are necessary to carry out his functions under this chapter"). And review under section 7607(b) is only "of action of the Administrator." In summary, plaintiffs' claims concern action taken by the EPA qua agency of the federal government, not as administrator or enforcer of the CAA, and hence are not subject to review under section 7607(b).
 
 
 46
 B. Conformity Determination in Absence of NEPA Compliance
 
 
 47
 Plaintiffs argue that since the district court found the air quality analyses used by the federal agencies deficient and not in compliance with NEPA, it should not have addressed the merits of the CAA claims. Neither the agencies nor the district court, the argument goes, could make reasoned conformity determinations under the CAA based on noncomplying air quality analyses. The argument raises two separate issues: Was a conformity determination precluded as a matter of law before completion of the NEPA process? And, even if it was not, could the Air Force and the FAA reasonably make such a determination before the NEPA process had been completed here?
 
 
 48
 We can readily dispose of the first issue. Section 7506(c)(1) sets forth its own standards for evaluating conformity. Nothing in that section or elsewhere in the CAA requires the information on which a conformity determination is based to have been subject to review, analysis, or public comment pursuant to NEPA. Moreover, regulations issued by the EPA in 1993 prescribing procedures and criteria for conformity determinations suggest no connection between NEPA and CAA compliance. See 42 U.S.C. § 7506(c)(4)(A); 40 C.F.R. Part 51, Subpart W (1994); 40 C.F.R. Part 93, Subpart B (1994). To the contrary, they specify that "[w]here multiple Federal agencies have jurisdiction for various aspects of a project, a Federal agency may choose to adopt the analysis of another Federal agency or develop its own analysis in order to make its conformity determination." 40 C.F.R. § 93.154 (1994). And 40 C.F.R. § 93.156(b) (1994) states that the 30-day comment period for an agency's draft conformity determination "may be concurrent with any other public involvement, such as occurs in the NEPA process." We see no basis for engrafting a requirement that the NEPA process be completed before a determination is made.
 
 
 49
 Plaintiffs next contend that the Air Force and the FAA could not reasonably make the conformity determination before completing the NEPA process. If the federal agencies had relied entirely on the FEIS as the basis for their conformity determinations, and if the district court had later found the analyses in the FEIS deficient under NEPA on substantive grounds that would also have affected the conformity analysis required by the CAA, the CAA conformity determination might also have been deficient. See, e.g., Sierra Club v. Sigler, 695 F.2d 957, 980-83 (5th Cir.), reh'g denied, 704 F.2d 1251 (1983). That, however, is not what happened here. The NEPA problem arose from a failure to comply with the public comment requirement in that the agencies relied for their conformity determination on information and analyses that they had failed to include in the FEIS or a Supplemental FEIS for public comment. The district court found that those materials were a sufficient basis for the conformity determinations; they simply should have been subject to public review and comment to meet the requirements of NEPA. See 864 F.Supp. at 284-85, 288. Because such public review and comment are not required under the conformity provision of the CAA, the NEPA violation did not affect the merits of the conformity determination and hence does not require that we defer passing on the conformity claims.
 
 C. Conformity Determination by the EPA
 
 50
 "In accordance with [the EPA's] responsibilities under ... [NEPA and CAA]," the EPA issued a review of the Air Force's FEIS on August 14, 1991. In that review, the EPA addressed air quality concerns related to the Pease project. It first reviewed its earlier conclusions that the project's air impacts would hinder New Hampshire's ability to achieve required reductions in ozone precursor emissions and would cause violations of the CO standards. The EPA then reviewed the terms of the MOU into which it had entered with PDA and NHDES and concluded that the MOU "provides a framework that, if successful, gives reasonable assurance that the Pease development can proceed in compliance with the CAA." The MOU itself quotes the text of section 7506(c) and states that its purpose is to "accommodate the statutory responsibilities of the Parties and provide assurance of orderly and phased development in compliance with CAA requirements." Moreover, the commitments in the MOU indicate that the EPA was considering the specific statutory criteria in the conformity provision. For example, the MOU specifies that, in the event the CO air quality analysis required by the MOU shows that proposed traffic increases from redevelopment "may cause or contribute to a new violation of the carbon monoxide NAAQS," PDA must implement measures necessary to reduce projected traffic increases and/or air emissions impacts to a level which will not result in such a condition. See infra pp. 1270-71.
 
 
 51
 Section 7506(c) does not specify the form a conformity determination must take; when the agencies acted, they had only the statute to guide them because the regulations were not adopted until 1993. Taking that fact into account, we think the EPA's actions sufficiently reflect that it considered the project's potential impact on air quality in light of the conformity provision and, based on the commitments in the MOU, see infra pp. 1267-68, determined that the project could be carried out in conformity with applicable air quality standards.
 
 
 52
 D. Agencies' Compliance with 42 U.S.C. § 7506(c)(1)
 
 
 53
 Having found that the EPA made the required conformity determination, we now consider whether its determination and the determinations made by the Air Force and the FAA complied with the statute. As noted, the statute prohibits federal agencies from supporting or approving a project unless that project "conform[s] to an implementation plan after it has been approved or promulgated under section 7410 of this title." 42 U.S.C. § 7506(c)(1). "[C]onformity to an implementation plan means"
 
 
 54
 (A) conformity to an implementation plan's purpose of eliminating or reducing the severity and number of violations of the national ambient air quality standards; and
 
 
 55
 (B) that such activities will not--
 
 
 56
 (i) cause or contribute to any new violation of any standard in any area;
 
 
 57
 (ii) increase the frequency or severity of any existing violation of any standard in any area; or
 
 
 58
 (iii) delay timely attainment of any standard or any required interim emission reductions or other milestones in any area.
 
 
 59
 42 U.S.C. § 7506(c)(1)(A), (B).
 
 
 60
 At the outset we note two relevant considerations: First, no regulations interpreting these provisions had been promulgated when the agencies made their conformity determinations; therefore, they had only the words of the statute to guide them. Second, a conformity determination is inherently fact-intensive; therefore, what constitutes conformity is a function of the unique characteristics of the project being approved.
 
 
 61
 1. Substance of the Conformity Determinations.
 
 
 62
 The EPA, the Air Force, and the FAA all determined that the transfer and redevelopment of Pease met the conformity requirements of section 7506(c)(1). As discussed above, evidence that the EPA made a conformity determination is found in the MOU and the EPA's review of the FEIS. See supra pp. 1262-63. The Air Force's conformity determination is contained in two documents: its ROD, issued August 20, 1991, and its Memorandum for the Record, issued March 20, 1992. The FAA's conformity determination is contained in its ROD, issued February 26, 1992. Those documents reveal the bases for the agencies' conformity determinations. We now examine those bases to determine whether the agencies abused their discretion when they found that the Pease project met the conformity requirements of section 7506(c)(1).
 
 
 63
 The agencies relied on information and commitments contained in various documents in making their conformity determinations. The EPA, as previously noted, based its conformity determination on the commitments made in the MOU. The Air Force based its determination on the MOU, post-FEIS studies conducted by NHDES and discussed in the letter of certification written by Robert W. Varney, Commissioner of NHDES (Varney letter), and the FAA's conditional approval of certain aspects of the Pease project. Similarly, the FAA based its conformity determination on the MOU, the NHDES studies and conclusions discussed in the Varney letter, the Governor's letter of assurance,[3] and its own conditional approval of certain aspects of the Pease project. Each of the bases of the agencies' conformity determinations is briefly summarized below.
 
 
 64
 a. The Memorandum of Understanding. Because the FEIS concluded that air emissions likely to be generated by the expected redevelopment of the airport would add to the level of ozone precursor emissions[4] experienced in the Portsmouth Metropolitan Statistical Area and because of the EPA's concerns about the air quality impacts of Pease redevelopment, the EPA, PDA, and NHDES entered into an agreement--the MOU--"to accommodate the statutory responsibilities of the Parties, and provide assurance of orderly and phased development in compliance with CAA requirements."
 
 
 65
 The MOU acknowledges that, because the region around Pease was a serious nonattainment region for ozone, the 1990 CAA amendments required New Hampshire to revise its SIP to achieve net reductions of 15% in total volatile organic compound (VOC) emissions by November 15, 1996, and 3% each year thereafter, until the region achieved compliance with the NAAQS for ozone. To ensure compliance with the CAA and the SIP, PDA and NHDES committed themselves, under the terms of the MOU, to take certain actions.
 
 
 66
 With respect to carbon monoxide (CO) emissions, the MOU provides that:
 
 
 67
 (1) PDA will undertake a surface transportation study examining existing vehicle traffic patterns, projected vehicle traffic increases associated with development, and potential for alternative modes of transportation.
 
 
 68
 (2) Based on the results of the transportation study, PDA will develop a comprehensive traffic model and surface transportation master plan for the Pease area.
 
 
 69
 (3) Using the traffic model and periodically updated traffic counts, PDA will undertake intermittent CO analyses to determine compliance with the one and eight hour CO NAAQS and report the results of all CO analyses to EPA.
 
 
 70
 (4) In the event that the CO analyses demonstrate that a proposed traffic increase from Pease redevelopment may cause or contribute to a new violation of the NAAQS for CO, PDA, in conjunction with any other state agency whose participation may be necessary, "will implement measures necessary to reduce projected traffic increases and/or air emissions impacts to a level which will not result in any violation of, or any contribution to a violation of, the NAAQS" for CO.
 
 
 71
 With respect to hydrocarbon (HC) emissions, PDA agreed not to develop Pease beyond a level anticipated to generate 3.3 tons per day of HCs until New Hampshire revised its SIP to accommodate greater emissions and the EPA approved the new SIP.
 
 
 72
 Finally, with respect to all emissions, NHDES agreed to consult with PDA in preparing the revised SIP and to evaluate and incorporate into the new SIP projected emission increases from Pease redevelopment.
 
 
 73
 b. NHDES Studies and the Varney Letter. The Varney letter considered two possible readings of the conformity requirements of section 7506(c)(1)(B): (1) that "the federal agency need only determine that the proposed activity is in conformity with the terms of the existing SIP," and (2) that "the determination must address the three elements set forth in § [7506(c)(1)(B) ] ... separately, regardless of the terms of the SIP." The letter concluded that Pease development conformed under either reading. This conclusion was based on studies of air emissions completed by NHDES after the FEIS was issued. These studies compared baseline emissions from 1989 (during full-scale military operations at Pease) and 1990 (when the CAA amendments were enacted and some military operations at Pease had already ceased) with projected emissions to 1997.[5] According to the Varney letter, the emissions were not projected beyond 1997 because such projections would be too speculative and because by 1997 New Hampshire would adopt a new SIP to address any increases in emissions.
 
 
 74
 Based on these studies, NHDES concluded, with respect to ozone, that by 1997 emissions of HCs, ozone's primary precursor, would likely reach approximately 2.5 tons per day, the same level as Pease emitted in 1990, when military operations were less than full-scale. At full-scale, HC emissions at Pease had been variously estimated at 3.3 to 4 tons per day, which was still in compliance with the existing SIP. Overall ozone levels generated locally were expected to decline because older cars, which produce more HCs, were slowly being replaced and because "stage II vapor recovery at gasoline filling stations" was commencing. For these reasons, projections of overall ozone levels generated by the Pease area were expected to remain below the 1989 and 1990 levels through Phase I of redevelopment.
 
 
 75
 With respect to CO emission levels, the NHDES studies showed that, comparing 1989 and 1990 to 1997, Pease redevelopment would not result in a significant increase in the air quality region. And improvement of the intersection at Spaulding Turnpike and Gosling Road (Spaulding Turnpike/Gosling Road interchange) would significantly lessen CO levels locally during the period studied.[6]
 
 
 76
 NHDES ultimately concluded that Pease redevelopment satisfied the three conformity criteria set out in section 7506(c)(1)(B): that, through 1997, Pease redevelopment would not cause or contribute to any new violation of any standard in any area; increase the frequency or severity of any existing violation of any standard in any area; or delay attainment of any standard or any required interim emission reductions or other milestones in any area.
 
 
 77
 NHDES also concluded that Phase I redevelopment would not violate any specific provision of the SIP but rather would "conform to the SIP's purpose of eliminating or reducing the severity and number of violations of the national ambient air quality standards, and achieving expeditious attainment of such standards." See 42 U.S.C. § 7506(c)(1)(A). NHDES reached this conclusion for several reasons: (1) the existing SIP was developed when Pease was fully operational and incorporated emissions from Pease at that level of operation; (2) Phase I of Pease redevelopment was expected to produce fewer emissions than the base produced during full operation; and (3) increased levels of emissions from later stages of development would be taken into account in the future SIP.
 
 
 78
 c. FAA's Approval of Airport Redevelopment. The FAA reviewed the Airport Layout Plan (ALP), PDA's proposal to redevelop airport-related property at Pease, as required by the Surplus Property Act. In its ROD, it approved each of the items in the ALP, either unconditionally or conditionally, and recommended that the Air Force proceed with its proposal to make property at Pease available for use as a civilian airport. It gave unconditional approval to the minor, interim and Phase I redevelopment outlined in the ALP but, to ensure conformity, only conditional approval to key items in the ALP. It concluded that its approval "conform[s] with the approved SIP."
 
 
 79
 Regarding the later phases of the redevelopment, which could have a significant impact on air quality, FAA approval will be required once plans for them are made final and proposed for implementation; that approval will be granted only after the FAA determines whether additional air quality analysis and a new conformity finding are required. Further, FAA approval will be required for any new projects not depicted in the ALP, providing additional assurances of conformity.
 
 
 80
 2. Plaintiffs' Challenges of the Conformity Determinations.
 
 
 81
 Plaintiffs charge that the agencies' conformity determinations ignore evidence demonstrating that redevelopment would cause new CO violations, increase existing ozone violations, and delay attainment of the clean air standards. Instead of properly addressing these problems prior to approval of the project, they contend, the agencies improperly shifted to New Hampshire the burden of achieving future conformity through amendments to the SIP.
 
 
 82
 a. Evidence of Violation of Conformity Criteria. Plaintiffs contend that the redevelopment of Pease will cause new violations of the NAAQS for CO, increase violations of the NAAQS for ozone, and delay attainment of CAA standards, in contravention of section 7506(c)(1)(B).
 
 
 83
 (i) Evidence Regarding Effects of Phase I Redevelopment. The NHDES studies discussed in the Varney letter and the post-FEIS studies on the Spaulding Turnpike/Gosling Road interchange indicate that Phase I redevelopment activities will conform to the section 7506(c)(1)(B) criteria, as long as New Hampshire improves the Spaulding Turnpike/Gosling Road interchange as required.[7] As discussed above, NHDES studies used 1989 and 1990 emissions estimates as the baseline for performing the conformity analyses. The EPA, Air Force, and the FAA adopted those studies in making their conformity determinations.
 
 
 84
 Section 7506(c)(1)(B) states that "[t]he determination of conformity shall be based on the most recent estimates of emissions...." NHDES explained that it selected 1989 and 1990 rather than 1991 (the year it performed the analysis) as baseline years because 1989 was
 
 
 85
 "the most recent year representative of full-scale military operation at Pease. This appears to us to be the most relevant comparison, since Congress's intention in Section [7506(c) ] is clearly to evaluate new developments in the context of pre-existing conditions.... We assume that Congress did not intend that a project like Pease redevelopment would be penalized under [7506(c) ] because there is a temporal gap between the federal government's decision to terminate operations at Pease and the start-up of the State's redevelopment of the base, during which a temporary reduction in the emission inventory occurred as a result of activity phase-down."
 
 
 86
 Use of 1991 as a baseline, it added, "would unfairly penalize the Pease redevelopment project, since 1991 emissions of CO, NO subx and VOCs are significantly less than historical norms because of the Air Force's cessation of activities at Pease."
 
 
 87
 Under the Chevron doctrine, an agency's interpretation of a statute is entitled to weight when the statute is silent or ambiguous. See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 2781-82, 81 L.Ed.2d 694 (1984). As an abstract matter, the words of the statute, "most recent estimates," would not be considered ambiguous; a literal interpretation would require the agencies to use 1991 data. See 42 U.S.C. § 7506(c)(1)(B) (conformity determination "shall be based on the most recent estimates of emissions....") (emphasis added).
 
 
 88
 Courts have, however, recognized that "[a] statute may be ambiguous if its application leads to an irrational or absurd result." Ewing v. Rodgers, 826 F.2d 967, 970 n. 3 (10th Cir.1987) (citing In re Rodman, 792 F.2d 125, 128 n. 8 (10th Cir.1986)); see also United States v. Real Estate Known as 916 Douglas Ave., 903 F.2d 490, 492 (7th Cir.1990), cert. denied, 498 U.S. 1126, 111 S.Ct. 1090, 112 L.Ed.2d 1194 (1991). Courts have also recognized that "[t]he plain meaning of legislation should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.' " United States v. Ron Pair Enters., 489 U.S. 235, 242, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989), (quoting Griffin v. Oceanic Contractors, Inc. 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982)) (emphasis added). This appears to us to be one of those rare cases where the plain meaning would lead to a result that is irrational and at odds with the intention of the legislature. Read literally, the plain language of the statute as applied in base-closing cases would require conformity determinations to be based on a wholly artificial situation, the interval during which military operations have shut down and civilian activities not yet started. The likely consequence in many cases would be to preclude any economically beneficial use of a closed military base. Such a result is irrational and presumably unintended by Congress. In view of Congress's strong support of civilian redevelopment of closed military bases, see P.L. 102-426, § 2, 106 Stat. 2174, it would not have wanted to erect a major obstacle to economically beneficial, post-closing uses of a base. Thus, the agencies' reliance on the NHDES studies based on 1989 and 1990 estimates was reasonable under the circumstances. Those studies support the determination that Phase I redevelopment meets the statutory conformity criteria.
 
 
 89
 (ii) Evidence Regarding Effects of Post-Phase I Redevelopment. Other air quality studies conducted by NHDES, however, suggest potential violation of the conformity criteria in later phases of Pease redevelopment, absent mitigation measures. With respect to CO emissions, the FEIS indicated that by the year 2010 redevelopment was expected to generate 68,000 daily vehicle trips into the Pease area. The main area of concern for traffic congestion causing emissions increases is the intersection of Spaulding Turnpike and Gosling Road. Post-FEIS air quality studies of that intersection indicated that, while construction of the new Spaulding Turnpike/Gosling Road interchange by NHDOT would bring the area into compliance with NAAQS for CO through the end of the decade, traffic volumes associated with Pease redevelopment and regional growth through the full build-out year 2010 could cause violations unless a second entrance interchange to Pease was constructed. Redevelopment would therefore contribute to new violations of the NAAQS for CO sometime after the turn of the century.
 
 
 90
 Similarly, an EPA memorandum dated July 24, 1991, indicated that, while Phase I of Pease redevelopment was expected to generate only 2.5 tons per day of HCs (a major ozone precursor), Phase II extending to the year 2002 was estimated to generate 4.8 tons per day. At that level, Phase II would increase existing violations, as well as delay attainment, of the NAAQS for ozone absent some other changes or the institution of mitigation measures.
 
 
 91
 b. Mitigation Measures. Plaintiffs contend that the supporting agencies improperly shifted the burden of compliance to New Hampshire and the SIP process and that the mitigation measures agreed to by the parties failed to meet the statutory criteria of the conformity provision.
 
 
 92
 (i) Carbon Monoxide. With respect to CO emissions, the MOU requires PDA to conduct a surface transportation study, develop a traffic model and master plan for the Pease area, conduct intermittent CO analyses, and implement mitigation measures as needed. As to the latter, the MOU states categorically that "PDA, and if necessary in conjunction with any other appropriate state agency, will implement measures necessary to reduce projected traffic increases and/or air emissions impacts to a level which will not result in any violation of, or any contribution to a violation of, the NAAQS for carbon monoxide." (Emphasis added.)
 
 
 93
 These commitments are sufficient to ensure compliance with the statutory requirement that Pease redevelopment "will not cause or contribute to any new violation" of the NAAQS for CO, see 42 U.S.C. § 7506(c)(1)(B)(i), for two reasons.
 
 
 94
 First, PDA's open-ended commitment to implement necessary mitigation measures includes by implication a commitment to implement the mitigation measures already identified in the area of the Spaulding Turnpike/Gosling Road interchange. See supra p. 1267. Specifically, it includes a commitment by PDA, along with NHDOT and other necessary state agencies, to build the second access to Pease, unless later studies reveal preferable alternatives for satisfying the commitment.
 
 
 95
 Corroborating this commitment is a July 31, 1991, letter from PDA to the Air Force stating that compliance with the NAAQS would require completion of improvements to the Spaulding Turnpike/Gosling Road interchange as well as construction of a second access to Pease prior to the time the improved interchange reaches maximum capacity. To permit construction of the second access, PDA requested that a portion of the golf course at Pease be made available. In the Application and Acceptance for the transfer of airport property, the Air Force agreed to transfer the needed portions of the golf course.
 
 
 96
 Second, the agreement requiring ongoing studies and analyses and implementation of mitigation measures as needed was a reasonable way to ensure conformity under the circumstances. The details of the redevelopment project are not fixed and its time line is extended. As the FAA pointed out in its ROD, air quality impacts stemming from certain aspects of the airport development were speculative when the conformity determinations were made because the project-specific design detail necessary to assess those impacts properly and develop a range of alternative mitigation measures was lacking. Similarly, the nonaviation business tenants at the on-airport industrial park had not yet been selected. In addition, over the 20-year life of Pease redevelopment, other environmental factors in the region, as well as technologies available to address them, may change. Given these uncertainties, a commitment to pursue ongoing studies and analyses and to implement appropriate mitigation measures based on demonstrated needs was a reasonable approach to meeting the statutory requirement.
 
 
 97
 (ii) Ozone Precursors. With respect to ozone standards, the MOU requires NHDES to work with PDA and incorporate projected emissions from Pease redevelopment into the SIP revisions.[8] Unless and until the new SIP is approved, however, it bars PDA from developing Pease "beyond the level anticipated to generate 3.3 tons per day of hydrocarbon emissions"--the level of emissions from Pease permitted under the existing SIP. Thus, the MOU does not place the entire burden of addressing HC emissions on the SIP process.
 
 
 98
 To the extent that the MOU does rely on the SIP process to deal with projected increases in HC emissions, however, it does so properly under the circumstances. The 1990 CAA amendments required New Hampshire to revise its SIP to address VOC emissions (which include HC emissions) within approximately three years. See 42 U.S.C. §§ 7511a(c), (b)(1). NHDES's commitment to consult with PDA and incorporate emissions from Pease development into required revisions of the SIP is consistent with the SIP process and NHDES's role as the state agency responsible for developing the SIP. While the EPA and the legislature set ultimate standards and goals--including the NAAQS and deadlines for attaining them--the state prescribes in its SIP how it will achieve those goals. See 42 U.S.C. § 7407. Thus, if NHDES chooses to incorporate into the required revisions of the SIP certain levels of emissions from the Pease project, that is its prerogative under the statutory SIP process.
 
 
 99
 By agreeing to incorporate Pease emissions into SIP revisions that will reduce overall ozone-precursor emissions in the region, NHDES has enabled PDA to undertake the redevelopment without increasing the severity of or delaying attainment of the NAAQS for ozone. Presumably New Hampshire will accommodate increased HC emissions from Pease and achieve interim required emissions reductions and timely attainment of the NAAQS for ozone by cutting VOC emissions in other areas. This will permit later stages of Pease redevelopment to go forward without increasing existing violations of the NAAQS for ozone or delaying attainment of the NAAQS for ozone or other CAA standards. 42 U.S.C. § 7506(c)(1)(B)(ii), (iii).
 
 
 100
 Unless and until a new SIP incorporating higher levels of emissions from Pease is approved, however, the MOU prohibits redevelopment of Pease beyond a level producing 3.3 tons per day of HC emissions. While the cap is in compliance with the terms of the existing SIP, it is not so clear it will ensure that Pease redevelopment activities will not increase the severity of existing ozone violations and delay compliance with ozone standards. Whether redevelopment will increase the severity of existing violations depends in part on the baseline emissions. When compared to 1989 emissions, 3.3 tons per day represents no increase in the severity of violations of the NAAQS for ozone. Because, as we stated earlier, use of 1989 estimates is reasonable under the circumstances, see supra pp. 1269-70, and because the existing SIP permits this level of emissions, the provisions of the MOU satisfy the conformity requirements under section 7506(c)(1)(B)(ii).
 
 
 101
 Regarding delaying attainment of the ozone standards, plaintiffs appear to suggest that to meet the section 7506(c)(1)(B)(iii) criteria, emissions from the Pease project must be consistent with the VOC emissions reductions set out in 42 U.S.C. § 7511a(c)(2). Prior to incorporation into a revised SIP, however, these reductions apply only in conformity decisions related to transportation plans, programs and projects and therefore are not relevant here. See 42 U.S.C. § 7506(c)(3)(A)(iii); see also 136 Cong.Rec. S16973 (October 27, 1990) (Statement of Senator Baucus, sponsor and manager of the Senate bill) ("[Transportation] plans and programs adopted for areas that are nonattainment for ozone or carbon monoxide during the interim period shall contribute to annual emission reductions consistent with the emissions reductions schedules adopted in the bill for such areas....") (emphasis added).
 
 IV. THE CERCLA CLAIM
 
 102
 Newington claims that the Air Force's 55-year lease of portions of Pease to PDA violates section 120(h)(3)(B)(i) of CERCLA (42 U.S.C. § 9620(h)(3)(B)(i)). The district court had jurisdiction over the claim under 42 U.S.C. § 9613(b) (1988). Section 120 was added by the 1986 Superfund Amendments and Reauthorization Act (SARA), Pub.L. No. 99-499, 100 Stat. 1613 (1986), to address issues concerning hazardous waste on federally-owned sites. Section 120(a) subjects federal agencies to CERCLA. Subsections (b) through (f) outline a comprehensive program to identify and remediate hazardous waste sites. Subsection (h) deals with transfers of property on which hazardous substances are known to have been released or disposed of. Subsection (h)(1) requires notice of such release or disposal in any contract "for the sale or other transfer of real property which is owned by the United States."
 
 
 103
 Subsection (h)(3) addresses the "contents of certain deeds." Before its recent amendment, it required that
 
 
 104
 ... in the case of any real property owned by the United States on which any hazardous substance was stored for one year or more, known to have been released, or disposed of, each deed entered into for the transfer of such property by the United States to any other person or entity shall contain--
 
 
 105
 (B) a covenant warranting that--
 
 
 106
 (i) all remedial action necessary to protect human health and the environment with respect to any such substance remaining on the property has been taken before the date of such transfer,....
 
 
 107
 42 U.S.C. § 9620(h)(3).
 
 
 108
 Newington argues that section 120(h)(3) prohibits the federal government from transferring contaminated property until it has constructed, installed and is successfully operating clean up procedures and mechanisms that ensure full remediation. Although section 120(h)(3) by its terms applies to deeds, Newington contends that the substance of the transaction should control and that the government should not be permitted to avoid the mandate of the statute by labeling the transaction a lease. The District Court held that the transfer without an approved remedial design violated section 120(h) of CERCLA, and that the failure to disclose in the FEIS the decision to transfer by way of a long-term lease rather than deed violated NEPA. See 864 F.Supp. at 290. Although the court declined to hold the leases void, it directed the Air Force to prepare a supplemental FEIS delineating the remedial design. Newington contends that the relief granted is inadequate to secure compliance with section 120(h).
 
 
 109
 Any question about whether section 120(h)(3) applies to long-term leases has been laid to rest by the 1996 amendment of that section, adding the following language:
 
 
 110
 The requirements of subparagraph (B) [of a covenant warranting completion of all necessary remedial action] shall not apply in any case in which the transfer of the property occurs or has occurred by means of a lease, without regard to whether the lessee has agreed to purchase the property or whether the duration of the lease is longer than 55 years.
 
 
 111
 National Defense Authorization Act for Fiscal Year 1996, Pub.L. No. 104-106, § 2834, 110 Stat. 186, 559 (1996).
 
 
 112
 "When a case implicates a federal statute enacted after the events in suit, the court's first task is to determine whether Congress has expressly prescribed the statute's proper reach." Landgraf v. USI Film Prods., --- U.S. ----, ----, 114 S.Ct. 1483, 1505, 128 L.Ed.2d 229 (1994). In this case, Congress left no doubt that the amendment was to apply to the instant lease. The Conference Report on the Defense Authorization Act states in part that section 2834 "addresses a recent federal district court decision that could undermine reuse plans at military installations selected for closure with similar reuse plans. The provision serves to clarify the legislative intent on the issue." H.R.Conf.Rep. No. 450, 104th Cong., 2d Sess. (1996). Senator Bob Smith of New Hampshire, the sponsor of the amendment, explained that the need for the amendment arose out of the District Court's decision in this case which "has ... placed a cloud over redevelopment efforts at Pease ... [and] has helped to hinder the expedited redevelopment of facilities across the Nation that are being closed under the Base Closure and Realignment Act.... The language that was included in section 2824 ... was intended to modify section 120(h)(3) ... to provide that the Department of Defense may enter into long-term ... leases while any phase of the cleanup is ongoing.... [N]ot only are existing leases appropriate, but future leases may be entered into...." 141 Cong.Rec. S11557 (daily ed. Aug. 5, 1995) (statement of Sen. Smith). The recent amendment validates the Air Force's lease to PDA under CERCLA.
 
 V. THE NEPA CLAIM
 
 113
 The federal defendants do not appeal the district court's order finding a violation of "the public disclosure requirements of NEPA" and directing the Air Force to "compile a Supplemental FEIS." With regard to the NEPA claims against the FAA, the FAA adopted the FEIS prepared by the Air Force; therefore, the district court's decision that the FEIS was deficient under NEPA binds the FAA. The only NEPA issue before us then is plaintiffs' appeal of the district court's denial of injunctive relief for the NEPA violations.
 
 
 114
 Plaintiffs first attack the denial of injunctive relief on the ground that the district court failed to make findings of fact and conclusions of law sufficient to meet the requirements of Fed.R.Civ.P. 52. Plaintiffs contend that the court failed to provide sufficient factual or legal support for its conclusion that plaintiffs "have [not] demonstrated the irreparable harm necessary for granting a preliminary injunction." See, 864 F.Supp. at 292.
 
 
 115
 "The purpose of Rule 52(a), pertinent to injunctions, is to provide the appellate court with a clear understanding of the decision." Wynn Oil Co. v. Purolator Chemical Corp., 536 F.2d 84, 85 (5th Cir.1976). "Rule 52(a) calls for a level of detail adequate to permit appellate review on factual issues, and what is adequate depends on the importance of an issue, its complexity, the depth and nature of evidence presented, and similar elements that vary from case to case." Knapp Shoes, Inc. v. Sylvania Mfg. Corp., 15 F.3d 1222, 1228 (1st Cir.1994). Although the district court did not discuss its factual or legal reasons for concluding that the plaintiffs did not suffer irreparable harm, its lengthy opinion provides a detailed discussion of the factual and legal bases for its substantive conclusions. That discussion, along with the voluminous and undisputed documentary evidence in the record, provides this court with sufficient information to determine whether the district court abused its discretion in denying injunctive relief; thus, the omission of a statement of reasons for the denial of injunctive relief was at most harmless error. See, e.g., Associated Elec. Coop., Inc. v. Mid-America Transp. Co., 931 F.2d 1266, 1272 (8th Cir.1991) ("failure to make findings of fact and conclusions of law may be harmless error where, as here, most relevant facts are undisputed and the law can be applied without the district court's assistance"); Koerpel v. Heckler, 797 F.2d 858, 866 n. 4 (10th Cir.1986) (even though district court "should have elaborated on the facts which formed the basis for its conclusions ... [s]uch an omission is, however, harmless error because the record supports such findings") (citation omitted); Huard-Steinheiser, Inc. v. Henry, 280 F.2d 79, 84 (6th Cir.1960) (failure of district court to put on record findings of fact and conclusions of law resulted in no prejudicial error where record clearly disclosed basis upon which denial of injunction rested).
 
 
 116
 Plaintiffs next challenge the court's decision to deny injunctive relief on the merits. Whether to grant injunctive relief under NEPA is governed by traditional equity standards. Sierra Club v. Marsh, 872 F.2d 497, 503-04 (1st Cir.1989). The court must consider the plaintiffs' likelihood of success on the merits, whether the plaintiffs would suffer irreparable harm without an injunction, the appropriate "balance" of harms to the plaintiffs and the defendants, and the effect upon the public interest. Planned Parenthood League of Mass. v. Bellotti, 641 F.2d 1006, 1009 (1st Cir.1981).
 
 
 117
 We review orders granting or denying injunctions for abuse of discretion. Celebrity, Inc. v. Trina, Inc., 264 F.2d 956, 958 (1st Cir.1959). "District courts have broad discretion to evaluate the irreparability of alleged harm and to make determinations regarding the propriety of injunctive relief." K-Mart Corp. v. Oriental Plaza, Inc., 875 F.2d 907, 915 (1st Cir.1989) (quoting Wagner v. Taylor, 836 F.2d 566, 575-76 (D.C.Cir.1987)).
 
 
 118
 The district court denied injunctive relief on the ground that plaintiffs would suffer no irreparable harm. Plaintiffs challenge this finding, relying on Sierra Club v. Marsh, 872 F.2d 497 (1st Cir.1989), and Massachusetts v. Watt, 716 F.2d 946 (1st Cir.1983). In those cases, we found irreparable harm to exist when agencies become entrenched in a decision uninformed by the proper NEPA process because they have made commitments or taken action to implement the uninformed decision. See Watt, 716 F.2d at 951-53; Marsh, 872 F.2d at 499-503. Our rationale derived from the purpose of NEPA: "NEPA is designed to influence the decision making process" by making "governmental officials notice environmental considerations and take them into account." Watt, 716 F.2d at 952. "Thus, when a decision to which NEPA obligations attach is made without the informed environmental consideration that NEPA requires, the harm that NEPA intends to prevent has been suffered." Id. That harm is not merely a procedural harm, but is "the added risk to the environment that takes place when governmental decision makers make up their minds without having before them an analysis (with prior public comment) of the likely effects of their decision upon the environment." Marsh, 872 F.2d at 500.
 
 
 119
 Plaintiffs argue that, without an injunction, development of Pease will continue and they will suffer the kind of irreparable harm we described in Watt and Marsh. As we emphasized there, however, our holdings did not mean "that a likely NEPA violation automatically calls for an injunction; the balance of harms may point the other way." See Marsh, 872 F.2d at 504 (quoting Watt, 716 F.2d at 952) (emphasis added). In Watt and Marsh, plaintiffs moved for injunctions in the earliest stages of development of the projects at issue, when NEPA injunctions could implement the statutory purpose in the sense that "bureaucratic decision makers ... are less likely to tear down a nearly completed project than a barely started project." Marsh, 872 F.2d at 500. In contrast, plaintiff here, well aware of the defective FEIS, waited nearly three years before moving for injunctive relief. CLF filed its complaint in March 1992, some six months after the challenged FEIS and ROD were issued; Newington filed its complaint in June 1992. Both complaints recited requests for permanent injunctions in their prayers for relief. Despite these early references to equitable relief, however, neither CLF nor Newington ever moved to restrain or enjoin any aspect of the project. When the cases came before the district court on cross-motions for summary judgment, plaintiffs' briefs focused on the merits of the substantive claims, not the need for injunctive relief. Only after the entry of the court's order granting summary judgment in part did plaintiffs argue, in a motion to amend, that they were entitled to broad injunctive relief.
 
 
 120
 To be taken into account in assessing the balance of harms is the fact that between the time when plaintiffs filed suit and when they ultimately moved for injunctive relief, significant commitments were made to the Pease project. The State of New Hampshire issued $8 million in general obligation bonds to fund the operation of PDA and $40 million in guaranteed bonds to help finance the location of two major tenants at Pease; construction contracts aggregating $50 million were entered and federal grants of more than $6 million received to support the airport operations; and more than 1,100 persons became employed by tenants and agencies as a result of the development project. These commitments would be placed at risk if an injunction were granted.
 
 
 121
 Thus, the type of public and private commitments with which Watt and Marsh were concerned had already been made here by the time plaintiffs sought injunctive relief. If harm was done, it largely had been done, not by the court's denial of injunctive relief, but by plaintiffs' failure to timely seek it. While it is true that as development continues other actions will be taken to implement the project, their impact will be only incremental. Future risks of environmental harm will be minimized, moreover, by the district court's retention of jurisdiction under its order that the Air Force compile a Supplemental FEIS, by the Air Force's commitment to this court that it "will use the SEIS to review its August 1991 ROD and April 1992 Supplemental ROD," and by the continuing oversight responsibilities of the FAA under the Surplus Property Act and of the EPA under the CAA.
 
 
 122
 Under these circumstances, it was not an abuse of discretion for the district court to deny the injunctive relief sought.
 
 VI. CONCLUSION
 
 123
 We reverse the district court's determination that defendants violated CERCLA and affirm the judgment below in all other respects. Pending the completion of the Supplemental FEIS on which the FAA is working in conjunction with the Air Force, we retain jurisdiction under the petitions of the NEPA claims against the FAA but dismiss the CAA claims against it.
 
 
 124
 SO ORDERED.
 
 
 
 *
 Of the Northern District of California, sitting by designation
 
 
 [1]
 Subsections (2) and (3) deal with controls, conditions, prohibitions and requirements related to specific situations and provisions not at issue here. Subsection (4) deals with conformity requirements under an SIP and does not apply because the requirements were not incorporated into New Hampshire's plan at the material times; the only relevant conformity requirements were those in effect under the Act itself. See 42 U.S.C. § 7604(f)(2)-(4)
 
 
 [2]
 The court also held that prior case law limiting citizen suit jurisdiction to enforcement of specific measures, commitments, and strategies for ensuring compliance with air quality standards did not preclude citizen suit jurisdiction over conformity provision claims because the requirements of the conformity provision were sufficiently specific and objective. CLF, 24 F.3d at 1477-78. While we do not disagree with that part of the analysis, we do not reach the specificity issue unless we find that the conformity provision otherwise falls within the statutory definition of an "emission standard or limitation."
 
 
 [3]
 Both the Air Force and the FAA cite Governor Judd Gregg's February 13, 1992, letter of assurance (Governor's letter) as one basis for their conformity determinations. Because the Governor's letter relied primarily on the NHDES studies and the Varney letter as the grounds for its assurance of conformity, we do not discuss it separately
 
 
 [4]
 Ozone precursors include nitrous oxide (NO subx ) and volatile compounds (VOCs) such as hydrocarbons (HC). See 40 C.F.R. § 51.852 (1995) (ozone precursors include NO subx and VOCs); 40 C.F.R. § 51.100(s) (1995) (VOCs include any compound of carbon except those listed in regulation)
 
 
 [5]
 Projected emissions to 1997 took into account redevelopment through Phase I of the Pease project, i.e., the first five years
 
 
 [6]
 Although the NHDES studies noted that the "air quality region" had "no historic attainment or maintenance problem with carbon monoxide" NAAQS, the air quality analysis in the FEIS had shown present and ongoing violations of the NAAQS for CO at the Gosling Road/Spaulding Turnpike interchange, the main gate to Pease. Post-FEIS supplemental air quality modeling of the interchange area, based on corrected data, showed that CO levels at the interchange would stay within the NAAQS through Phase I of redevelopment upon completion of scheduled improvements at the interchange
 
 
 [7]
 New Hampshire is committed to making these improvements because, as noted above, NHDES's conclusion that Pease redevelopment through Phase I meets the conformity criteria was based on the assumption that this interchange would be improved. See supra p. 1265 n. 6. Similarly the FAA's conformity determination was based in part on improvement of the Spaulding Turnpike/Gosling Road interchange
 
 
 [8]
 According to the 1990 Amendments, New Hampshire was required to revise its SIP to achieve at least a 15% reduction in VOC emissions (including HCs) from 1990 levels on or before November of 1996 (accounting for any growth in emissions after 1990), and 3% additional annual reductions on average thereafter through 1999. See 42 U.S.C. § 7511a(b)(1)(A) & (c)(2)(B) (Supp. III 1991)