United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued March 21, 2002 Decided June 14, 2002 

 No. 00-1548

 City of Olmsted Falls, Ohio, 
 Petitioner

 v.

 Federal Aviation Administration and 
 Department of Transportation, 
 Respondents

 City of Cleveland, Ohio, 
 Intervenor

 On Petition for Review of an Order of the 
 Federal Aviation Administration

 Barbara E. Lichman argued the cause for petitioner. 
With her on the briefs was Berne C. Hart.

 Martin D. Gelfand, Staff Counsel, U.S. House of Represen-
tatives, was on the brief for amicus curiae U.S. Representa-
tive Dennis J. Kucinich in support of petitioner.

 Lisa E. Jones, Attorney, U.S. Department of Justice, ar-
gued the cause for respondents. With her on the brief were 
John C. Cruden, Assistant Attorney General, James C. Kil-
bourne, and Andrew C. Mergen, Attorneys.

 Michael M. Conway argued the cause for intervenor City 
of Cleveland, Ohio. With him on the brief was Michael 
Schneiderman.

 Alan B. Daughtry and Sharon M. Mattox were on the brief 
for amicus curiae Continental Airlines Corporation, Inc. in 
support of respondent.

 Before: Sentelle, Henderson and Tatel, Circuit Judges.

 Opinion for the Court filed by Circuit Judge Sentelle.

 Sentelle, Circuit Judge: The City of Olmsted Falls, Ohio, 
petitions this Court for review of the Federal Aviation Admin-
istration's ("FAA") approval of the Record of Decision for a 
runway improvement project at Cleveland Hopkins Interna-
tional Airport. See Notice of Approval of the Record of 
Decision for Proposed Development at the Cleveland Hopkins 
International Airport, Cleveland, Ohio, 65 Fed. Reg. 70374-75 
(Nov. 22, 2000). The runway improvement project includes 
the relocation of one existing runway, the shift and extension 
of the other parallel runway, and other attendant projects. 
Olmsted Falls contends that the FAA's approval was arbi-
trary and capricious, in violation of: Clean Air Act Section 
176(c), 42 U.S.C. s 7506(c); the National Environmental Poli-
cy Act, 42 U.S.C. s 4321, et seq. ("NEPA"); and Section 4(f) 
of the Department of Transportation Act, 49 U.S.C. s 303(c) 
("DOT Act"). Olmsted Falls also argues that a supplemental 
environmental impact statement is required under NEPA. 
Because the FAA's approval of the Record of Decision was 
neither arbitrary nor capricious, and because no further 
documentation is required under NEPA, we deny the petition 
for review.

 I. Background

 Cleveland Hopkins International Airport ("CLE" or "the 
airport") is owned by the City of Cleveland, Ohio, and operat-
ed by Cleveland's Department of Port Control. CLE is a 
major hub for Continental Airlines and as such serves as an 
important mid-country hub for the National Airspace System 
as defined by the FAA. The airport is currently served by 
three active runways: the two parallel runways, which run 
northeast/southwest, are separated by only 441 feet, and a 
third crosswind runway is primarily used by turboprop craft. 
Due to the extremely narrow separation between the two 
parallel runways, CLE currently uses one exclusively for 
arrivals and the other exclusively for departures, reducing 
capacity and increasing airfield complexity. Studies conduct-
ed by the Cleveland Department of Port Control and the 
FAA indicated that the current runway configuration at CLE 
is inadequate and modernization is required to alleviate safety 
risks and to meet future regional and national air travel 
needs. These studies indicated that by 2003 the existing 
airport runway system would operate at levels of delay in 
excess of 12 minutes per aircraft during peak periods.

 In 1999, the Cleveland Department of Port Control began 
preparing a Master Plan Update, a study used to develop and 
evaluate facilities recommendations consistent with the air-
port's character and activity levels. Specifically, the Depart-
ment of Port Control sought to develop solutions for CLE 
that would enhance safety, improve efficiency, and lessen the 
environmental impacts of the airport. After evaluating vari-
ous airfield and air traffic alternatives, the Department of 
Port Control issued its Airport Layout Plan. The Airport 
Layout Plan proposed updating both runways to ensure they 
meet current FAA design standards and to generally enhance 
safety, while providing for anticipated demand. The Plan 
recommended relocating and replacing one of the parallel 
runways 1241 feet away from the other. The remaining 
original runway would be shifted 960 feet southwest and 
extended 2250 feet. This would create greater spacing be-
tween the two runways and thus accommodate two parallel 
taxiways between the runways.

 While the Master Plan Update was being prepared by the 
Department of Port Control, the FAA began the public phase 
of the environmental review process in May 1998. In October 
1999, the FAA issued the draft environmental impact state-
ment ("EIS") for the implementation of the Master Plan 
Update and the Airport Layout Plan projects. These pro-
jects were the preferred alternative in the draft EIS, and 
were the subject of written comments by the City of Olmsted 
Falls ("the City" or "Olmsted Falls"). Following public com-
ment, the FAA released the final EIS in June 2000, and 
issued the Record of Decision on November 8, 2000. The 
Record of Decision contains the rationale for all required 
findings and provides approval for certain projects included in 
the Department of Port Control's Airport Layout Plan.

 Olmsted Falls filed this petition for review of the Record of 
Decision on December 29, 2000, pursuant to 49 U.S.C. 
s 46110(a). Subsequently this Court denied Olmsted Falls' 
motion to stay and motion to expedite.

 II. Analysis

 A. Standing

 Before reaching the merits of Olmsted Falls' petition, we 
must determine whether the City has standing before this 
Court. To satisfy the constitutional requirement of standing, 
a plaintiff or petitioner must, at an "irreducible constitutional 
minimum ... demonstrate that it has suffered a concrete and 
particularized injury that is: (1) actual or imminent, (2) 
caused by or fairly traceable to, an act that the litigant 
challenges in the instant litigation, and (3) redressable by the 
court." Florida Audubon Soc'y v. Bentsen, 94 F.3d 658, 663 
(D.C. Cir. 1996) (en banc) (internal quotation marks and 
citations omitted); see Lujan v. Defenders of Wildlife, 504 
U.S. 555, 560-61 (1992). The federal respondents1 contend 

__________
 1 Federal respondents include the Department of Transportation, 
DOT Secretary Mineta, the FAA, FAA Administrator Garvey, and 
FAA Regional Administrator Hunzinger. For convenience we refer 
to them hereinafter as "the FAA."

that the City failed "clearly to allege facts" sufficient to 
demonstrate standing. SunCom Mobile & Data, Inc. v. FCC, 
87 F.3d 1386, 1387-88 (D.C. Cir. 1996) (quoting Warth v. 
Seldin, 422 U.S. 490, 518 (1975)). "It is the responsibility of 
the complainant clearly to allege facts demonstrating that he 
is a proper party to invoke judicial resolution of the dispute 
and the exercise of the court's remedial powers." Warth, 422 
U.S. at 518. According to the FAA, Olmsted Falls failed, in its 
petition and opening brief, to submit any affidavits or present 
any factual evidence at all showing that it had suffered an 
injury specific to itself.

 In response, the City first contends that it has the neces-
sary "geographic nexus" required to bring an action under 
"an environmental statute," in that it is located two miles to 
the southwest of CLE. However, geographic proximity does 
not, in and of itself, confer standing on any entity under 
NEPA or any other statute. Rather, it is the concrete and 
particularized injury which has occurred or is imminent due 
to geographic proximity to the action challenged that gives 
rise to Article III standing. See, e.g., Lujan, 504 U.S. at 572-
73 & n.7; Dubois v. U.S. Dep't of Agriculture, 102 F.3d 1273, 
1283 (1st Cir. 1996). Moreover, as a matter of prudential 
standing, "we have squarely held that a NEPA claim may not 
be raised by a party with no claimed or apparent environmen-
tal interest. It cannot be used as a handy stick by a party 
with no interest in protecting against an environmental injury 
to attack a defendant." Town of Stratford, CT v. FAA, 285 
F.3d 84, 88 (D.C. Cir. 2002) (citation omitted). Thus, Olmsted 
Falls must allege an injury related to an environmental 
interest--geographic proximity might be necessary to show 
such an injury, but it is not sufficient.

 The City further claims that it may represent its citizens, 
much as a private association could represent its members' 
interests. According to the City, "it may properly be inferred 
that its citizens will use the water from the same watershed 
into which Abram Creek flows and will breathe the air 
containing the increased construction and aircraft emissions 
from the Project undispersed by any significant distance from 
its points of emission." The City's analogy of its representa-

tion of its citizens to a private organization's representation of 
its members misconceives the very concept of associational 
standing. "An association only has standing to bring suit on 
behalf of its members when its members would otherwise 
have standing to sue in their own right, the interests it seeks 
to protect are germane to the organization's purpose, and 
neither the claim asserted nor the relief requested requires 
the participation of individual members in the lawsuit." 
Fund Democracy, LLC v. SEC, 278 F.3d 21, 25 (D.C. Cir. 
2002) (emphasis added); see Friends of the Earth, Inc. v. 
Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 181 (2000). 
The City does not have "members" who have voluntarily 
associated, nor are the interests it seeks to assert here 
germane to its purpose. Rather the City is effectively at-
tempting to assert the alleged interests of its citizens under 
the doctrine of parens patriae. Arguably, this theory of 
standing is unavailable because a state may not sue the 
federal government on behalf of its citizens as parens patriae. 
E.g. Kansas v. United States, 16 F.3d 436, 439 (D.C. Cir. 
1994); see also Alfred L. Snapp & Son, Inc. v. Puerto Rico, 
458 U.S. 592, 610 n.16 (1982). Although "the state, under 
some circumstances, may sue in that capacity for the protec-
tion of its citizens, it is no part of its duty or power to enforce 
their rights in respect of their relations with the federal 
government. In that field it is the United States, and not the 
state, which represents them as parens patriae." Massachu-
setts v. Mellon, 262 U.S. 447, 485-86 (1923) (internal citation 
omitted). As municipalities derive their existence from the 
state and function as political subdivisions of the state, pre-
sumably they too cannot sue the federal government under 
the doctrine of parens patriae.

 We need not, however, decide that question. In this Cir-
cuit we have found standing for a city suing an arm of the 
federal government when a harm to the city itself has been 
alleged. E.g. City of Lafayette, La. v. SEC, 481 F.2d 1101, 
1103 n.3 (D.C. Cir. 1973) ("The Cities satisfy the standing 
requirement by alleging injury in fact and a non-frivolous 
claim that the 1935 Act requires consideration of the Cities' 
contentions in an acquisition proceeding."); City of Los Ange-

les v. National Highway Traffic Safety Admin., 912 F.2d 478, 
484-85 (D.C. Cir. 1990), overruled in part, Florida Audubon 
Soc'y v. Bentsen, 94 F.3d 658 (D.C. Cir. 1996) ("The polities' 
claim to standing rests upon an entirely different footing. 
They assert that the CAFE standard of 26.0 mpg for MYs 
87-88 adversely affects air quality in their urban areas, 
making it more difficult for them to comply, as they must, 
with the air quality standards imposed upon them by the 
Clean Air Act."). Thus, Olmsted Falls may bring this peti-
tion if it alleges harm to itself as city qua city. Taking a 
generous reading of the petitioner's materials, we find that 
Olmsted Falls has alleged harm to its own economic interests 
based on the environmental impacts of the approved project. 
Although it is a close question, we conclude that the City has 
standing to bring this action.

 B. FAA Approval of the Record of Decision

 Olmsted Falls raises four principal objections to the FAA's 
approval of the Record of Decision for the runway improve-
ment projects at CLE. First, the City contends that the FAA 
has violated the conformity provisions of the Clean Air Act, 
Section 176(c), 42 U.S.C. s 7506(c), by omitting analysis of 
nitrogen oxides (NOx) from at least 21 undisclosed construc-
tion projects and improperly determining that emissions from 
the CLE improvement Plan will not exceed the 100 tons NOx 
per year de minimis threshold established by the Environ-
mental Protection Agency ("EPA"). See 40 C.F.R. s 93.153. 
Second, arguing that the FAA failed to consider adequately 
the water quality impacts of the CLE improvement Plan, 
Olmsted Falls challenges the FAA's failure to disclose (al-
leged) non-compliance with the Clean Water Act as a violation 
of NEPA. Third, the City insists that the alleged degrada-
tion of Abram Creek, caused by a culverting of a portion of 
the creek to build the relocated runway, constitutes a "use" of 
parkland requiring "full analysis" under Section 4(f) of the 
Department of Transportation Act, 49 U.S.C. s 303(c). Fi-
nally, Olmsted Falls believes that these alleged errors require 
a remand for the FAA to perform a supplemental EIS 
pursuant to NEPA.

 These challenges are reviewed under the Administrative 
Procedure Act's ("APA") arbitrary and capricious standard. 
This standard is applied to review compliance with NEPA 
and to determine the adequacy of an EIS, see Marsh v. 
Oregon Natural Resources Council, 490 U.S. 360, 376 (1989), 
as well as to review of determinations required by the Clean 
Air Act. See Ethyl Corp. v. EPA, 51 F.3d 1053, 1064 (D.C. 
Cir. 1995) (standard for judicial review under Clean Air Act 
taken directly from Administrative Procedure Act). Under 
NEPA, the "role of the courts is simply to ensure that the 
agency has adequately considered and disclosed the environ-
mental impact of its actions and that its decision is not 
arbitrary or capricious." Baltimore Gas & Elec. v. NRDC, 
462 U.S. 87, 97-98 (1983). Courts review the EIS to "ensure 
that the agency took a 'hard look' at the environmental 
consequences of its decision to go forward with the project." 
City of Grapevine, Tex. v. DOT, 17 F.3d 1502, 1503-04 (D.C. 
Cir. 1994) (upholding FAA approval of an airport plan).

 Notwithstanding the City's assertion to the contrary, the 
FAA's conformity analysis under 42 U.S.C. s 7506(c) is evalu-
ated under the arbitrary and capricious standard set forth in 
the APA. See, e.g., Conservation Law Foundation, Inc. v. 
Busey, 79 F.3d 1250, 1260-63 (1st Cir. 1996). Section 176(c) of 
the Clean Air Act, 42 U.S.C. s 7506(c), charges the heads of 
"department[s], agenc[ies], or instrumentalit[ies] of the Fed-
eral Government" with "assur[ing] ... conformity." Indeed, 
the implementing regulations specify that "[a]ny Federal 
department, agency, or instrumentality of the Federal gov-
ernment taking an action subject to this subpart must make 
its own conformity determination consistent with the require-
ments of this subpart" and that, if it wishes to, "[w]here 
multiple Federal agencies have jurisdiction for various as-
pects of a project, a Federal agency may choose to adopt the 
analysis of another Federal agency ... in order to make its 
conformity determination." 40 C.F.R. s 93.154 (emphasis 
added). Thus in reviewing a challenge to such a determina-
tion, we apply the same standard we would to any other final 
agency action--the arbitrary and capricious standard set 
forth in the APA. See Busey, 79 F.3d at 1260-61. Petitioner 

contends that since the Clean Air Act does not vest responsi-
bility for implementation of the Clean Air Act with the FAA 
and the "FAA's sole area of statutorily mandated responsibili-
ty under the Clean Air Act is consultation with the [U.S. 
Environmental Protection Agency] in the establishment and 
enforcement of aircraft engine emission standards," the FAA 
is not entitled to deference. The City seems to be conflating 
arbitrary and capricious review with Chevron deference. Un-
der Chevron U.S.A., Inc. v. Natural Resources Defense Coun-
cil, Inc., 467 U.S. 837 (1984), we defer to administrative 
agencies "when it appears that Congress delegated authority 
to the agency generally to make rules carrying the force of 
law, and that the agency interpretation claiming deference 
was promulgated in the exercise of that authority." United 
States v. Mead Corp., 533 U.S. 218, 226-27 (2001). It is 
because of this delegation, express or implied, that we give 
deference to an agency's statutory interpretation. Thus, 
when we are faced with an agency's interpretation of a 
statute not committed to its administration, we give no defer-
ence. E.g. Ass'n of Civilian Technicians v. FLRA, 269 F.3d 
1112, 1115-16 (D.C. Cir. 2001). Here, however, the FAA has 
not purported to interpret the conformity provisions of the 
Clean Air Act, but rather only to apply them.

 Finally, where the FAA is forecasting capacity and "pre-
dicting demand at an airport, the agency's conclusion is due 
'more deference.' " City of Los Angeles v. FAA, 138 F.3d 
806, 807 n.2 (9th Cir. 1998). That such determinations are 
integral to, indeed, inseparable from, the overall conformity 
analysis here further confirms that the arbitrary and capri-
cious standard of review applies. With this standard of 
review in mind, we consider, and reject, each challenge in 
turn.

 1. Clean Air Act

 Petitioner argues that the FAA failed to adequately dis-
close and analyze various air quality impacts of the proposed 
CLE project, in violation of the Clean Air Act. First, it 
suggests that there are 21 construction-related projects which 

the FAA omitted from the air quality analysis in the EIS and 
Record of Decision, including the NOx emissions arising from 
6880 days of unreported construction equipment operation. 
According to Olmsted Falls, these omissions show an addi-
tional 5.76 tons of NOx per year could be generated in 2001, 
7.57 tons per year possibly in 2002, and 4.84 tons per year 
potentially in 2003, which would exceed the de minimis 
threshold of 100 tons NOx per year, and thus violate the 
Clean Air Act's conformity provisions. 40 C.F.R. s 93.153; 
42 U.S.C. s 7506(c). Because even a small use of various 
pieces of construction equipment could breach the de minim-
is threshold, the petitioner contends "there remains an open 
question as to whether Project emissions will exceed the 100 
ton per year NOx de minimis threshold in at least 2001-
2003."

 Second, petitioner also contends that the FAA acted arbi-
trarily and capriciously in determining the baseline for emis-
sions if the CLE redevelopment is not pursued. In essence, 
Olmsted Falls claims that the FAA overestimated the "natu-
ral" growth that would occur without improvements and 
failed to substantiate its claim that the existing airfield capac-
ity could accommodate this supposed "natural" growth. Be-
cause the CLE redevelopment could attract additional air 
traffic, it is the City's position that the FAA underestimated 
the increase in NOx emissions due to the increased capacity 
arising from the redevelopment project.

 Finally, Olmsted Falls asserts that the de minimis excep-
tion does not apply to "airport expansions" because in pro-
mulgating its final rule implementing the Clean Air Act's 
conformity provisions, the EPA stated that "[l]arger projects, 
such as an airport expansion ... would require a conformity 
review under all of these de minimis levels." Determining 
Conformity of General Federal Actions to State or Federal 
Implementation Plans, 58 Fed. Reg. 63214, 63228 (Nov. 30, 
1993) (emphasis added). As a consequence, it is Olmsted 
Falls' position that we must remand and require the FAA to 
perform a full conformity analysis and supplemental EIS.

 In response, the FAA contends that it "complied with CAA 
requirements, conformed to relevant regulations, and followed 
FAA's own guidance documents," in analyzing construction 
emissions and "reasonably determined that emissions for the 
project, including construction emissions for the project, will 
not at any time during the construction or implementation of 
the project, meet or exceed the thresholds established" in the 
Clean Air Act, and were, therefore, de minimis. According 
to the FAA, the record provides no basis on which to second 
guess the combined expertise of the FAA and the agencies 
which reviewed its determinations (the EPA, Ohio EPA, and 
the Metropolitan Planning Organization). Further, it is the 
FAA's position that petitioner has waived this Clean Air Act 
claim by failing to challenge the FAA's methodology during 
the administrative proceedings and never previously arguing 
that the construction emissions analysis failed to account for 
these alleged 21 construction projects. See 49 U.S.C. 
s 46110(d); Northwest Airlines, Inc. v. DOT, 15 F.3d 1112, 
1120-21 (D.C. Cir. 1994). Even if this claim is not waived, 
the FAA argues that all elements of the construction required 
for, and related to, the CLE runway improvement project 
were disclosed in the final EIS and analyzed as part of FAA's 
air quality analysis. The FAA also contends that it relied on 
an appropriate baseline in its calculation of natural growth 
and that this determination is due substantial deference.

 In determining whether Olmsted Falls is barred from using 
these 21 projects to challenge the FAA's conformity analysis, 
we must consider whether the FAA had adequately disclosed 
the 21 projects. It appears that it did. Both the draft EIS 
and the final EIS disclose all of the projects approved in the 
Record of Decision, though not all of the activities approved 
include construction activity. The FAA grouped all of the 
projects into four major construction activities and estimated 
NOx emissions from each activity. Both the draft EIS and 
the final EIS identified various "independent utility projects" 
and explained that these projects were "not dependent or 
interdependent upon the approval of the federal actions" 
which were the subject of the EIS and would be "completed 
regardless of the approval and progress of the airport devel-

opment proposed" in the EIS. Thus these projects were 
"included within the Baseline (No-Action/No-Build) Alterna-
tive as well as within each development alternative." Yet, at 
no point after the draft EIS or the final EIS did Olmsted 
Falls raise claims before the FAA involving these 21 con-
struction projects. Moreover, Olmsted Falls could have re-
quested data and calculations supporting the FAA's conformi-
ty determination under 40 C.F.R. s 93.156, but failed to do so 
until one day before the Record of Decision was signed. We 
agree with the FAA that Olmsted Falls, by not challenging 
the alleged non-inclusion of these 21 projects before the FAA, 
waived this claim under the Clean Air Act.

 Even were we to find that these 21 projects were not 
adequately disclosed by the FAA, we would conclude that 
Olmsted Falls has failed to carry its burden of proof of 
showing that this non-disclosure undermined the FAA's de-
termination. " '[T]he party challenging an agency's action as 
arbitrary and capricious bears the burden of proof.' " Lomak 
Petroleum, Inc. v. FERC, 206 F.3d 1193, 1198 (D.C. Cir. 
2000) (quoting San Luis Obispo Mothers For Peace v. United 
States Nuclear Regulatory Comm'n, 789 F.2d 26, 37 (D.C. 
Cir. 1986) (en banc)). Indeed, "[e]ven assuming [the FAA] 
made missteps ... the burden is on petitioners to demon-
strate that [the FAA's] ultimate conclusions are unreason-
able." National Petrochemical & Refiners Ass'n v. EPA, 287 
F.3d 1130, 1146 (D.C. Cir. 2002). Here petitioner concedes 
that the emissions from these 21 projects might undermine 
the FAA's de minimis determination, not that they necessari-
ly will. Thus Olmsted Falls has failed to show that the FAA's 
"overall determination" is unreasonable. Id. As the FAA 
explains, some of the projects petitioner describes were con-
sidered as sub-elements within the major construction catego-
ries. Some independent utility projects were subject to sepa-
rate NEPA analyses and included as part of the baseline for 
the project because they were not dependent or interdepen-
dent upon the approval of the federal actions requested in the 
EIS. Finally, some of these projects were routine mainte-
nance that are the kind that would be conducted with or 
without FAA review or federal approval or funding, and thus 

were excluded. Moreover, the FAA explains that in calculat-
ing emissions from construction, it conservatively estimated a 
10-hour workday and an average work month of 20 days--
without considering likely work stoppage for inclement 
weather. Based on this conservative approach, the operational 
hours for the replacement runway construction included over 
2000 additional hours as compared to similar projects at other 
airports. In short, we cannot say that the FAA's determina-
tion was arbitrary and capricious.

 Nor is the FAA's determination of the baseline for natural 
growth at CLE, and thus the baseline for NOx emissions, 
arbitrary and capricious. The FAA determined that the 
airport can accommodate the predicted demand for 2006, 
based on its current airfield configuration and without the 
proposed improvements. While there may be delays, FAA 
defines capacity without reference to delay goals. Here the 
improvements are to move an existing runway, not the addi-
tion of a runway, and thus in the FAA's judgment they will 
not induce demand. According to the FAA, its forecasts 
show that "the demand for air travel at CLE is independent 
of the proposed improvements at the Airport." In other 
words, "if you don't build it, they will come anyway." City of 
Los Angeles v. FAA, 138 F.3d 806, 807 (9th Cir. 1998); see 
also National Parks & Conservation Ass'n v. DOT, 222 F.3d 
677, 680 (9th Cir. 2000). The FAA's expertise in forecasting 
air transportation demand and airfield capacity are areas 
where courts accord significant deference. See National 
Parks, 222 F.3d at 682; City of Los Angeles, 138 F.3d at 807 
n.2. As the FAA is entitled to rely upon its demand and 
capacity forecasts, and to credit the views of its own ex-
perts--who are charged with determining demand and capac-
ity issues for the National Airspace System--over Olmsted 
Falls' contrary views, we cannot say that the FAA's determi-
nation was unreasonable. See City of Bridgeton v. FAA, 212 
F.3d 448, 459 (8th Cir. 2000); Custer County Action Assoc. v. 
Garvey, 256 F.3d 1024, 1036 (10th Cir. 2001). In sum, 
petitioner has failed to carry its burden to demonstrate that 
the FAA's ultimate conclusion that the de minimis exception 
applied was unreasonable.

 As for the applicability of the de minimis exception, we 
find nothing in the EPA's rule implementing conformity 
provisions that prohibits the FAA from applying such an 
exception. 40 C.F.R. s 93.153. The EPA's language is 
merely illustrative, simply acknowledging that "[l]arger pro-
jects" would generally exceed the de minimis limitations, and 
airport expansions tend to be larger projects. 58 Fed. Reg. at 
63228. Of course, this project is not an airport expansion, 
but rather a relocation of an existing runway. In any event, 
this language does not appear in the EPA's rule, only in the 
accompanying commentary. See id.; 40 C.F.R. s 93.153. 
Because the FAA's finding that the NOx emissions resulting 
from the proposed CLE redevelopment fall within the de 
minimis threshold is not unreasonable, we reject petitioner's 
Clean Air Act claims.

 2. NEPA

 The City contends that the FAA "failed to disclose that the 
[airport redevelopment] Project would not meet State or 
Federal water quality standards even though it knew that to 
be the case," claiming that the evidence before the FAA 
"conclusively demonstrates that water quality would be per-
manently and adversely affected by the development of the 
Project." According to Olmsted Falls these assertions are 
not a collateral attack on the decisions of state environmental 
authorities allowing the redevelopment of the airport to go 
forward, but merely demonstrate that by failing to disclose 
this (alleged) non-compliance with the Clean Water Act, the 
FAA has failed to comply with NEPA. The City then 
explains that a Clean Water Act Section 401 permit, 33 U.S.C 
s 1341, was not obtained from the local authorities, rather 
they only granted a waiver, which Olmsted Falls contends 
they have no power to do under state law. According to the 
City, although federal law gives the Army Corps of Engineers 
the power to accept a waiver, 33 C.F.R. 325.2(b)(ii); 40 C.F.R. 
121.16(a), it is only "where State law allows such a waiver" 
and "such power does not exist under Ohio law." See Ohio 
Rev. Code s 6111.03P; Ohio Admin. Code s 3745-32-07. 
The absence of a valid section 401 permit or waiver is alleged 

to undermine the section 404 permit issued by the Corps of 
Engineers. 33 U.S.C. s 1344.

 Respondents contend that this is essentially a collateral 
attack on the state environmental Director's decision to grant 
a waiver: "To the extent Olmsted disagrees with OEPA's 
decision, arguments attacking this decision have no place 
here." We agree. Although the petitioner may disagree with 
the substantive decisions made by the various agencies in-
volved in an EIS, neither NEPA nor any other statute 
confers jurisdiction on this Court to hear such challenges as 
part of this proceeding. See 42 U.S.C. s 4332; 49 U.S.C. 
s 46110. When reviewing an environmental impact state-
ment, it does not matter whether we agree with the agency's 
conclusions. Rather, the EIS acts as a procedural safeguard. 
See, e.g., City of Los Angeles, 138 F.3d at 807. As for the 
section 401 permits, it was not arbitrary or capricious for the 
FAA to rely on the determination of the local authorities. 
Unlike the respondents in Natural Resources Defense Coun-
cil v. Daley, 209 F.3d 747 (D.C. Cir. 2000), which turned on an 
agency's assumption that states would voluntarily comply 
with a quota, here the FAA has not merely assumed that 
proper permits would be issued; rather, it was clear that 
receipt of requisite permits was a condition of approval. 
This is not a proper forum for Olmsted Falls to assail the 
Ohio EPA's decision to grant a waiver. Indeed, at oral 
argument, petitioner conceded it was pursuing litigation in a 
local forum. Further, any challenge to a section 404 permit 
should be brought in district court under the Clean Water Act 
in the first instance. There is no basis in the petitioner's 
NEPA-based allegations upon which we can grant relief.

 3. Department of Transportation Act Section 4(f)

 Petitioner contends that the FAA inadequately analyzed 
alternatives under Section 4(f) of the Department of Trans-
portation Act, 49 U.S.C. s 303(c), because if it had "it would 
have ascertained that the anticipated degradation of Abram 
Creek indeed constitutes a use of parkland and public waters 
that warrants the full analysis mandated by s 4(f)." "The 

'use' of parklands within the meaning of section 4(f) includes 
not only actual, physical takings of such lands but also 
significant adverse indirect impacts as well." Allison v. DOT, 
908 F.2d 1024, 1028 (D.C. Cir. 1990). The City alleges that 
the "massive filling" and culverting of Abram Creek would 
seriously damage the creek's "use as a ... habitat," its 
"aesthetic value," and also "crush its wildlife." Olmsted Falls 
contends that the FAA declined to engage in the exploration 
of more prudent and reasonable alternatives, or the develop-
ment of a plan that would minimize the (alleged) harm. See 
49 U.S.C. s 303(c). The City contends that the FAA violated 
section 4(f) because it failed to consider options to determine 
what would cause the least harm. However, respondents 
contend that the petitioner's section 4(f) arguments are juris-
dictionally barred as the City failed to raise them below.

 We are, of course, barred by statute from considering this 
argument if, as the FAA argues, petitioner failed to articulate 
it before the agency. 49 U.S.C. s 46110(d) ("court may 
consider an objection to an order of the ... Administrator 
only if the objection was made in the proceeding conducted by 
the ... Administrator or if there was a reasonable ground for 
not making the objection in the proceeding"); see also North-
west Airlines, 15 F.3d at 1120-21; Horizon Air Indus., Inc. 
v. DOT, 850 F.2d 775, 780 (D.C. Cir. 1988); Continental Air 
Lines, Inc. v. DOT, 843 F.2d 1444, 1455 (D.C. Cir. 1988). 
There is no evidence that Olmsted Falls raised this issue 
before the FAA. Indeed, the City failed to respond to the 
FAA's allegation of waiver in its reply brief. Therefore we 
dismiss this claim as jurisdictionally barred.

 4. Supplemental EIS

 Petitioner contends that the claims it makes demonstrate 
that there are "significant new circumstances or information 
relevant to environmental concerns" that require a supple-
mental EIS. 40 C.F.R. s 1502.9(c)(1)(ii). The undisclosed 
construction projects allegedly provide a basis for a supple-
mental EIS, as does the status of the water quality analyses. 
The City argues that these "new circumstances" are especial-

ly significant where, as here, they go directly to non-
compliance with the purpose and substantive requirements of 
the Clean Air Act and the Clean Water Act.

 As respondents point out, much of what Olmsted Falls dubs 
"new" is not. It was all known to the FAA prior to the 
issuance of the Record of Decision. A supplemental EIS is 
only required where new information "provides a seriously 
different picture of the environmental landscape." E.g. Wis-
consin v. Weinberger, 745 F.2d 412, 418 (7th Cir. 1984) 
(emphasis in original). Given our rejection of the City's other 
claims, there simply is not significant new information, and 
the landscape is unchanged. The decision to undertake a 
supplemental EIS is subject to a "rule of reason." Marsh v. 
Oregon Natural Resources Council, 490 U.S. 360, 374 (1989). 
Petitioner must show that it was arbitrary and capricious for 
the respondents not to undertake a supplemental EIS. The 
City has failed to meet its burden.

 III. Conclusion

 Reading its filings before this Court generously, we hold 
that the City of Olmsted Falls alleged sufficient harm to itself 
as a city to have standing. Reaching the merits, we reject 
each of the petitioner's claims. The FAA's determination 
that NOx emissions from the CLE airport redevelopment 
would be de minimis was not arbitrary and capricious. Olm-
sted Falls' NEPA claim is in essence a collateral attack on the 
underlying substance of the local environmental authorities' 
determinations. As the FAA was entitled to rely on these 
determinations, the City's NEPA claim is without merit. The 
City's claim under the DOT Act is barred because it had not 
been raised previously. Given our findings, the FAA's deci-
sion not to undertake a supplemental EIS was not arbitrary 
and capricious. The petition for review is denied.